# WAINWRIGHT, SECRETARY, DEPARTMENT OF OFFENDER REHABILITATION OF FLORIDA *v.* SYKES

No. 75–1578.   Argued March 29, 1977—Decided June 23, 1977

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, POWELL, and STEVENS, JJ., joined. BURGER, C. J., post, p. 91, and STEVENS, J., post, p. 94, filed concurring opinions. WHITE, J., filed an opinion concurring in the judgment, post, p. 97. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, post, p. 99.

*Charles Corces, Jr.,* Assistant Attorney General of Florida, argued the cause for petitioner. With him on the brief was *Robert L. Shevin,* Attorney General.

*William F. Casler,* by appointment of the Court, 429 U. S. 957, argued the cause and filed a brief for respondent.

*Edward R. Korman* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were

*Solicitor General Bork, Assistant Attorney General Thornburgh,* and *Deputy Solicitor General Frey.*

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

We granted certiorari to consider the availability of federal habeas corpus to review a state convict's claim that testimony was admitted at his trial in violation of his rights under *Miranda* v. *Arizona,* 384 U. S. 436 (1966), a claim which the Florida courts have previously refused to consider on the merits because of noncompliance with a state contemporaneous-objection rule. Petitioner Wainwright, on behalf of the State of Florida, here challenges a decision of the Court of Appeals for the Fifth Circuit ordering a hearing in state court on the merits of respondent's contention.

Respondent Sykes was convicted of third-degree murder after a jury trial in the Circuit Court of DeSoto County. He testified at trial that on the evening of January 8, 1972, he told his wife to summon the police because he had just shot Willie Gilbert. Other evidence indicated that when the police arrived at respondent's trailer home, they found Gilbert dead of a shotgun wound, lying a few feet from the front porch. Shortly after their arrival, respondent came from across the road and volunteered that he had shot Gilbert, and a few minutes later respondent's wife approached the police and told them the same thing. Sykes was immediately arrested and taken to the police station.

Once there, it is conceded that he was read his *Miranda* rights, and that he declined to seek the aid of counsel and indicated a desire to talk. He then made a statement, which was admitted into evidence at trial through the testimony of the two officers who heard it,[1] to the effect that he had shot Gilbert from the front porch of his trailer home. There were several references during the trial to respondent's consump-

---

[1] No written statement was offered into evidence because Sykes refused to sign the statement once it was typed up. Tr. 35.

tion of alcohol during the preceding day and to his apparent state of intoxication, facts which were acknowledged by the officers who arrived at the scene. At no time during the trial, however, was the admissibility of any of respondent's statements challenged by his counsel on the ground that respondent had not understood the *Miranda* warnings.[2] Nor did the trial judge question their admissibility on his own motion or hold a factfinding hearing bearing on that issue.

Respondent appealed his conviction, but apparently did not challenge the admissibility of the inculpatory statements.[3] He later filed in the trial court a motion to vacate the conviction and, in the State District Court of Appeals and Supreme Court, petitions for habeas corpus. These filings, apparently for the first time, challenged the statements made to police on grounds of involuntariness. In all of these efforts respondent was unsuccessful.

Having failed in the Florida courts, respondent initiated the present action under 28 U. S. C. § 2254, asserting the inadmissibility of his statements by reason of his lack of understanding of the *Miranda* warnings.[4] The United States District Court for the Middle District of Florida ruled that *Jackson* v. *Denno*,

---

[2] At one point early in the trial defense counsel did object to admission of any statements made by respondent to the police, on the basis that the basic elements of an offense had not yet been established. The judge ruled that the evidence could be admitted "subject to [the crime's] being properly established later." *Id.*, at 16.

[3] In a subsequent state habeas action, the Florida District Court of Appeals, Second District, stated that the admissibility of the postarrest statements had been raised and decided on direct appeal. *Sykes* v. *State*, 275 So. 2d 24 (1973). The United States District Court in the present action explicitly found to the contrary, App. to Pet. for Cert. A–21, and respondent does not challenge that finding.

[4] Respondent expressly waived "any contention or allegation as regards ineffective assistance of counsel" at his trial. App. A–47. He advanced an argument challenging the jury instructions relating to justifiable homicide, but the District Court concluded in a single paragraph that the instructions had been adequate.

378 U. S. 368 (1964), requires a hearing in a state criminal trial prior to the admission of an inculpatory out-of-court statement by the defendant. It held further that respondent had not lost his right to assert such a claim by failing to object at trial or on direct appeal, since only "exceptional circumstances" of "strategic decisions at trial" can create such a bar to raising federal constitutional claims in a federal habeas action. The court stayed issuance of the writ to allow the state court to hold a hearing on the "voluntariness" of the statements.

Petitioner warden appealed this decision to the United States Court of Appeals for the Fifth Circuit. That court first considered the nature of the right to exclusion of statements made without a knowing waiver of the right to counsel and the right not to incriminate oneself. It noted that *Jackson* v. *Denno, supra,* guarantees a right to a hearing on whether a defendant has knowingly waived his rights as described to him in the *Miranda* warnings, and stated that under Florida law "[t]he burden is on the State to secure [a] prima facie determination of voluntariness, not upon the defendant to demand it." 528 F. 2d 522, 525 (1976).

The court then directed its attention to the effect on respondent's right of Florida Rule Crim. Proc. 3.190 (i),[5] which it described as "a contemporaneous objection rule" applying to motions to suppress a defendant's inculpatory statements.

---

[5] Rule 3.190 (i):

"Motion to Suppress a Confession or Admissions Illegally Obtained.

"(1) *Grounds.* Upon motion of the defendant or upon its own motion, the court shall suppress any confession or admission obtained illegally from the defendant.

"(2) *Time for Filing.* The motion to suppress shall be made prior to trial unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion, but the court in its discretion may entertain the motion or an appropriate objection at the trial.

"(3) *Hearing.* The court shall receive evidence on any issue of fact necessary to be decided in order to rule on the motion."

It focused on this Court's decisions in *Henry* v. *Mississippi*, 379 U. S. 443 (1965); *Davis* v. *United States*, 411 U. S. 233 (1973); and *Fay* v. *Noia*, 372 U. S. 391 (1963), and concluded that the failure to comply with the rule requiring objection at the trial would only bar review of the suppression claim where the right to object was deliberately bypassed for reasons relating to trial tactics. The Court of Appeals distinguished our decision in *Davis, supra* (where failure to comply with a rule requiring pretrial objection to the indictment was found to bar habeas review of the underlying constitutional claim absent showing of cause for the failure and prejudice resulting), for the reason that "[a] major tenet of the *Davis* decision was that no prejudice was shown" to have resulted from the failure to object. It found that prejudice is "inherent" in any situation, like the present one, where the admissibility of an incriminating statement is concerned. Concluding that "[t]he failure to object in this case cannot be dismissed as a trial tactic, and thus a deliberate by-pass," the court affirmed the District Court order that the State hold a hearing on whether respondent knowingly waived his *Miranda* rights at the time he made the statements.

The simple legal question before the Court calls for a construction of the language of 28 U. S. C. § 2254 (a), which provides that the federal courts shall entertain an application for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." But, to put it mildly, we do not write on a clean slate in construing this statutory provision.[6] Its earliest counterpart, applicable only

---

[6] For divergent discussions of the historic role of federal habeas corpus, compare: Hart, The Supreme Court, 1958 Term, Foreword: The Time Chart of the Justices, 73 Harv. L. Rev. 84 (1959); Reitz, Federal Habeas Corpus: Impact of an Abortive State Proceeding, 74 Harv. L. Rev. 1315 (1961); Brennan, Federal Habeas Corpus and State Prisoners: An Exer-

to prisoners detained by federal authority, is found in the Judiciary Act of 1789. Construing that statute for the Court in *Ex parte Watkins,* 3 Pet. 193, 202 (1830), Mr. Chief Justice Marshall said:

"An imprisonment under a judgment cannot be unlawful, unless that judgment be an absolute nullity; and it is not a nullity if the Court has general jurisdiction of the subject, although it should be erroneous."

See *Ex parte Kearney,* 7 Wheat. 38 (1822).

In 1867, Congress expanded the statutory language so as to make the writ available to one held in state as well as federal custody. For more than a century since the 1867 amendment, this Court has grappled with the relationship between the classical common-law writ of habeas corpus and the remedy provided in 28 U. S. C. § 2254. Sharp division within the Court has been manifested on more than one aspect of the perplexing problems which have been litigated in this connection. Where the habeas petitioner challenges a final judgment of conviction rendered by a state court, this Court has been called upon to decide no fewer than four different questions, all to a degree interrelated with one another: (1) What types of federal claims may a federal habeas court properly consider? (2) Where a federal claim is cognizable by a federal habeas court, to what extent must that court defer to a resolution of the claim in prior state proceedings? (3) To what extent must the petitioner who seeks federal habeas exhaust state remedies before resorting to the federal court? (4) In what instances will an adequate and independent state

cise in Federalism, 7 Utah L. Rev. 423 (1961); Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv. L. Rev. 441, 468 (1963); Oaks, Legal History in the High Court—Habeas Corpus, 64 Mich. L. Rev. 451 (1966); Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 170–171 (1970); and Note, Developments in the Law—Federal Habeas Corpus, 83 Harv. L. Rev. 1038 (1970).

ground bar consideration of otherwise cognizable federal issues on federal habeas review?

Each of these four issues has spawned its share of litigation. With respect to the first, the rule laid down in *Ex parte Watkins, supra,* was gradually changed by judicial decisions expanding the availability of habeas relief beyond attacks focused narrowly on the jurisdiction of the sentencing court. *See Ex parte Wells,* 18 How. 307 (1856); *Ex parte Lange,* 18 Wall. 163 (1874). *Ex parte Siebold,* 100 U. S. 371 (1880), authorized use of the writ to challenge a conviction under a federal statute where the statute was claimed to violate the United States Constitution. *Frank* v. *Mangum,* 237 U. S. 309 (1915), and *Moore* v. *Dempsey,* 261 U. S. 86 (1923), though in large part inconsistent with one another, together broadened the concept of jurisdiction to allow review of a claim of "mob domination" of what was in all other respects a trial in a court of competent jurisdiction.

In *Johnson* v. *Zerbst,* 304 U. S. 458, 463 (1938), an indigent federal prisoner's claim that he was denied the right to counsel at his trial was held to state a contention going to the "power and authority" of the trial court, which might be reviewed on habeas. Finally, in *Waley* v. *Johnston,* 316 U. S. 101 (1942), the Court openly discarded the concept of jurisdiction—by then more a fiction than anything else—as a touchstone of the availability of federal habeas review, and acknowledged that such review is available for claims of "disregard of the constitutional rights of the accused, and where the writ is the only effective means of preserving his rights." *Id.,* at 104–105. In *Brown* v. *Allen,* 344 U. S. 443 (1953), it was made explicit that a state prisoner's challenge to the trial court's resolution of dispositive federal issues is always fair game on federal habeas. Only last Term in *Stone* v. *Powell,* 428 U. S. 465 (1976), the Court removed from the purview of a federal habeas court challenges resting on the Fourth Amendment, where there has been a full and fair opportunity to raise them

in the state court. See *Schneckloth* v. *Bustamonte*, 412 U. S. 218, 250 (1973) (POWELL, J., concurring).

The degree of deference to be given to a state court's resolution of a federal-law issue was elaborately canvassed in the Court's opinion in *Brown* v. *Allen, supra.* Speaking for the Court, Mr. Justice Reed stated: "[Such] state adjudication carries the weight that federal practice gives to the conclusion of a court of last resort of another jurisdiction on federal constitutional issues. It is not *res judicata.*" 344 U. S., at 458. The duty of the federal habeas court to hold a factfinding hearing in specific situations, notwithstanding the prior resolution of the issues in state court, was thoroughly explored in this Court's later decision in *Townsend* v. *Sain,* 372 U. S. 293 (1963). Congress addressed this aspect of federal habeas in 1966 when it amended § 2254 to deal with the problem treated in *Townsend.* 80 Stat. 1105. See *LaVallee* v. *Delle Rose,* 410 U. S. 690 (1973).

The exhaustion-of-state-remedies requirement was first articulated by this Court in the case of *Ex parte Royall,* 117 U. S. 241 (1886). There, a state defendant sought habeas in advance of trial on a claim that he had been indicted under an unconstitutional statute. The writ was dismissed by the District Court, and this Court affirmed, stating that while there was power in the federal courts to entertain such petitions, as a matter of comity they should usually stay their hand pending consideration of the issue in the normal course of the state trial. This rule has been followed in subsequent cases, *e. g., Cook* v. *Hart,* 146 U. S. 183 (1892); *Whitten* v. *Tomlinson,* 160 U. S. 231 (1895); *Baker* v. *Grice,* 169 U. S. 284 (1898); *Mooney* v. *Holohan,* 294 U. S. 103 (1935), and has been incorporated into the language of § 2254.[7] Like other

---

[7] 28 U. S. C. § 2254:

"(b) An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available

issues surrounding the availability of federal habeas corpus relief, though, this line of authority has not been without historical uncertainties and changes in direction on the part of the Court. See *Ex parte Hawk,* 321 U. S. 114, 116–117 (1944); *Darr* v. *Burford,* 339 U. S. 200 (1950); *Irvin* v. *Dowd,* 359 U. S. 394, 405–406 (1959); *Fay* v. *Noia,* 372 U. S. 391, 435 (1963).

There is no need to consider here in greater detail these first three areas of controversy attendant to federal habeas review of state convictions. Only the fourth area—the adequacy of state grounds to bar federal habeas review—is presented in this case. The foregoing discussion of the other three is pertinent here only as it illustrates this Court's historic willingness to overturn or modify its earlier views of the scope of the writ, even where the statutory language authorizing judicial action has remained unchanged.

As to the role of adequate and independent state grounds, it is a well-established principle of federalism that a state decision resting on an adequate foundation of state substantive law is immune from review in the federal courts. *Fox Film Corp.* v. *Muller,* 296 U. S. 207 (1935); *Murdock* v. *Memphis,* 20 Wall. 590 (1875). The application of this principle in the context of a federal habeas proceeding has therefore excluded from consideration any questions of state *substantive* law, and thus effectively barred federal habeas review where questions of that sort are either the only ones raised by a petitioner or are in themselves dispositive of his case. The area of controversy which has developed has concerned the reviewability of federal claims which the state court has declined to pass on

in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

"(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented."

because not presented in the manner prescribed by its *procedural* rules. The adequacy of such an independent state procedural ground to prevent federal habeas review of the underlying federal issue has been treated very differently than where the state-law ground is substantive. The pertinent decisions marking the Court's somewhat tortuous efforts to deal with this problem are: *Ex parte Spencer,* 228 U. S. 652 (1913); *Brown* v. *Allen,* 344 U. S. 443 (1953); *Fay* v. *Noia, supra; Davis* v. *United States,* 411 U. S. 233 (1973); and *Francis* v. *Henderson,* 425 U. S. 536 (1976).

In *Brown, supra,* petitioner Daniels' lawyer had failed to mail the appeal papers to the State Supreme Court on the last day provided by law for filing, and hand delivered them one day after that date. Citing the state rule requiring timely filing, the Supreme Court of North Carolina refused to hear the appeal. This Court, relying in part on its earlier decision in *Ex parte Spencer, supra,* held that federal habeas was not available to review a constitutional claim which could not have been reviewed on direct appeal here because it rested on an independent and adequate state procedural ground. 344 U. S., at 486–487.

In *Fay* v. *Noia, supra,* respondent Noia sought federal habeas to review a claim that his state-court conviction had resulted from the introduction of a coerced confession in violation of the Fifth Amendment to the United States Constitution. While the convictions of his two codefendants were reversed on that ground in collateral proceedings following their appeals, Noia did not appeal and the New York courts ruled that his subsequent *coram nobis* action was barred on account of that failure. This Court held that petitioner was nonetheless entitled to raise the claim in federal habeas, and thereby overruled its decision 10 years earlier in *Brown* v. *Allen, supra:*

"[T]he doctrine under which state procedural defaults are held to constitute an adequate and independent state

law ground barring direct Supreme Court review is not to be extended to limit the power granted the federal courts under the federal habeas statute." 372 U. S., at 399.

As a matter of comity but not of federal power, the Court acknowledged "a limited discretion in the federal judge to deny relief . . . to an applicant who had deliberately by-passed the orderly procedure of the state courts and in so doing has forfeited his state court remedies." *Id.*, at 438. In so stating, the Court made clear that the waiver must be knowing and actual—" 'an intentional relinquishment or abandonment of a known right or privilege.' " *Id.*, at 439, quoting *Johnson* v. *Zerbst*, 304 U. S., at 464. Noting petitioner's "grisly choice" between acceptance of his life sentence and pursuit of an appeal which might culminate in a sentence of death, the Court concluded that there had been no deliberate bypass of the right to have the federal issues reviewed through a state appeal.[8]

---

[8] Not long after *Fay*, the Court in *Henry* v. *Mississippi*, 379 U. S. 443 (1965), considered the question of the adequacy of a state procedural ground to bar direct Supreme Court review, and concluded that failure to comply with a state contemporaneous-objection rule applying to the admission of evidence did not necessarily foreclose consideration of the underlying Fourth Amendment claim. The state procedural ground would be "adequate," and thus dispositive of the case on direct appeal to the United States Supreme Court, only where "the State's insistence on compliance with its procedural rule serves a legitimate state interest." *Id*, at 447. Because, the Court reasoned, the purposes of the contemporaneous-objection rule were largely served by the motion for a directed verdict at the close of the State's case, enforcement of the contemporaneous-objection rule was less than essential and therefore lacking in the necessary "legitimacy" to make it an adequate state ground.

Rather than searching the merits of the constitutional claim, though, the Court remanded for determination whether a separate adequate state ground might exist—that is, whether petitioner had knowingly and deliberately waived his right to object at trial for tactical or other reasons. This was the same type of waiver which the Court in *Fay* had said must be demonstrated in order to bar review on state procedural grounds in a federal habeas proceeding.

A decade later we decided *Davis* v. *United States, supra,* in which a federal prisoner's application under 28 U. S. C. § 2255 sought for the first time to challenge the makeup of the grand jury which indicted him. The Government contended that he was barred by the requirement of Fed. Rule Crim. Proc. 12 (b)(2) providing that such challenges must be raised "by motion before trial." The Rule further provides that failure to so object constitutes a waiver of the objection, but that "the court for cause shown may grant relief from the waiver." We noted that the Rule "promulgated by this Court and, pursuant to 18 U. S. C. § 3771, 'adopted' by Congress, governs by its terms the manner in which the claims of defects in the institution of criminal proceedings may be waived," 411 U. S., at 241, and held that this standard contained in the Rule, rather than the *Fay* v. *Noia* concept of waiver, should pertain in federal habeas as on direct review. Referring to previous constructions of Rule 12 (b)(2), we concluded that review of the claim should be barred on habeas, as on direct appeal, absent a showing of cause for the noncompliance and some showing of actual prejudice resulting from the alleged constitutional violation.

Last Term, in *Francis* v. *Henderson, supra,* the rule of *Davis* was applied to the parallel case of a state procedural requirement that challenges to grand jury composition be raised before trial. The Court noted that there was power in the federal courts to entertain an application in such a case, but rested its holding on "considerations of comity and concerns for the orderly administration of criminal justice . . . ." 425 U. S., at 538–539. While there was no counterpart provision of the state rule which allowed an exception upon some showing of cause, the Court concluded that the standard derived from the Federal Rule should nonetheless be applied in that context since " '[t]here is no reason to . . . give greater preclusive effect to procedural defaults by federal defendants than

to similar defaults by state defendants.'" *Id.*, at 542, quoting *Kaufman* v. *United States*, 394 U. S. 217, 228 (1969). As applied to the federal petitions of state convicts, the *Davis* cause-and-prejudice standard was thus incorporated directly into the body of law governing the availability of federal habeas corpus review.

To the extent that the dicta of *Fay* v. *Noia* may be thought to have laid down an all-inclusive rule rendering state contemporaneous-objection rules ineffective to bar review of underlying federal claims in federal habeas proceedings—absent a "knowing waiver" or a "deliberate bypass" of the right to so object—its effect was limited by *Francis*, which applied a different rule and barred a habeas challenge to the makeup of a grand jury. Petitioner Wainwright in this case urges that we further confine its effect by applying the principle enunciated in *Francis* to a claimed error in the admission of a defendant's confession.

Respondent first contends that any discussion as to the effect that noncompliance with a state procedural rule should have on the availability of federal habeas is quite unnecessary because in his view Florida did not actually have a contemporaneous-objection rule. He would have us interpret Florida Rule Crim. Proc. 3.190 (i),[9] which petitioner asserts is a traditional "contemporaneous objection rule," to place the burden on the trial judge to raise on his own motion the question of the admissibility of any inculpatory statement. Respondent's approach is, to say the least, difficult to square with the language of the Rule, which in unmistakable terms and with specified exceptions requires that the motion to suppress be raised before trial. Since all of the Florida appellate courts refused to review petitioner's federal claim on the merits after his trial, and since their action in so doing is quite consistent with a line of Florida authorities inter-

---

[9] See n. 5, *supra.*

preting the rule in question as requiring a contemporaneous objection, we accept the State's position on this point. See *Blatch* v. *State,* 216 So. 2d 261, 264 (Fla. App. 1968); *Dodd* v. *State,* 232 So. 2d 235, 238 (Fla. App. 1970); *Thomas* v. *State,* 249 So. 2d 510, 512 (Fla. App. 1971).

Respondent also urges that a defendant has a right under *Jackson* v. *Denno,* 378 U. S. 368 (1964), to a hearing as to the voluntariness of a confession, even though the defendant does not object to its admission. But we do not read *Jackson* as creating any such requirement. In that case the defendant's objection to the use of his confession was brought to the attention of the trial court, *id.,* at 374, and n. 4, and nothing in the Court's opinion suggests that a hearing would have been required even if it had not been. To the contrary, the Court prefaced its entire discussion of the merits of the case with a statement of the constitutional rule that was to prove dispositive—that a defendant has a "right at some stage in the proceedings *to object* to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness . . . ." *Id.,* at 376–377 (emphasis added). Language in subsequent decisions of this Court has reaffirmed the view that the Constitution does not require a voluntariness hearing absent some contemporaneous challenge to the use of the confession.[10]

We therefore conclude that Florida procedure did, consistently with the United States Constitution, require that respondent's confession be challenged at trial or not at all, and

---

[10] In *Pinto* v. *Pierce,* 389 U. S. 31, 32 (1967), the Court stated: "*Jackson* v. *Denno,* 378 U. S. 368 (1964), held that a defendant's constitutional rights are violated when his challenged confession is introduced without a determination by the trial judge of its voluntariness after an adequate hearing. . . ."

In *Lego* v. *Twomey,* 404 U. S. 477, 478 (1972), we summarized the *Jackson* holding as conferring the right to a voluntariness hearing on "a criminal defendant who challenges the voluntariness of a confession" sought to be used against him at trial.

thus his failure to timely object to its admission amounted to an independent and adequate state procedural ground which would have prevented direct review here. See *Henry* v. *Mississippi,* 379 U. S. 443 (1965). We thus come to the crux of this case. Shall the rule of *Francis* v. *Henderson, supra,* barring federal habeas review absent a showing of "cause" and "prejudice" attendant to a state procedural waiver, be applied to a waived objection to the admission of a confession at trial? [11] We answer that question in the affirmative.

As earlier noted in the opinion, since *Brown* v. *Allen,* 344 U. S. 443 (1953), it has been the rule that the federal habeas petitioner who claims he is detained pursuant to a final judgment of a state court in violation of the United States Constitution is entitled to have the federal habeas court make its own independent determination of his federal claim, without being bound by the determination on the merits of that claim reached in the state proceedings. This rule of *Brown* v. *Allen* is in no way changed by our holding today. Rather, we deal only with contentions of federal law which were *not* resolved on the merits in the state proceeding due to respondent's failure to raise them there as required by state procedure. We leave open for resolution in future decisions the precise definition of the "cause"-and-"prejudice" standard, and note here only that it is narrower than the standard set forth in dicta in *Fay* v. *Noia,* 372 U. S. 391 (1963), which would make federal habeas review generally available to state convicts absent a knowing and deliberate waiver of the federal constitutional contention. It is the sweeping language of *Fay* v. *Noia,* going

---

[11] Petitioner does not argue, and we do not pause to consider, whether a bare allegation of a *Miranda* violation, without accompanying assertions going to the actual voluntariness or reliability of the confession, is a proper subject for consideration on federal habeas review, where there has been a full and fair opportunity to raise the argument in the state proceeding. See *Stone* v. *Powell,* 428 U. S. 465 (1976). We do not address the merits of that question because of our resolution of the case on alternative grounds.

far beyond the facts of the case eliciting it, which we today reject.[12]

The reasons for our rejection of it are several. The contemporaneous-objection rule itself is by no means peculiar to Florida, and deserves greater respect than *Fay* gives it, both for the fact that it is employed by a coordinate jurisdiction within the federal system and for the many interests which it serves in its own right. A contemporaneous objection enables the record to be made with respect to the constitutional claim when the recollections of witnesses are freshest, not years later in a federal habeas proceeding. It enables the judge who observed the demeanor of those witnesses to make the factual determinations necessary for properly deciding the federal constitutional question. While the 1966 amendment to § 2254 requires deference to be given to such determinations made by state courts, the determinations themselves are less apt to be made in the first instance if there is no contemporaneous objection to the admission of the evidence on federal constitutional grounds.

A contemporaneous-objection rule may lead to the exclusion of the evidence objected to, thereby making a major contribution to finality in criminal litigation. Without the evidence claimed to be vulnerable on federal constitutional

---

[12] We have no occasion today to consider the *Fay* rule as applied to the facts there confronting the Court. Whether the *Francis* rule should preclude federal habeas review of claims not made in accordance with state procedure where the criminal defendant has surrendered, other than for reasons of tactical advantage, the right to have all of his claims of trial error considered by a state appellate court, we leave for another day.

The Court in *Fay* stated its knowing-and-deliberate-waiver rule in language which applied not only to the waiver of the right to appeal, but to failures to raise individual substantive objections in the state trial. Then, with a single sentence in a footnote, the Court swept aside all decisions of this Court "to the extent that [they] may be read to suggest a standard of discretion in federal habeas corpus proceedings different from what we lay down today . . . ." 372 U. S., at 439 n. 44. We do not choose to paint with a similarly broad brush here.

grounds, the jury may acquit the defendant, and that will be the end of the case; or it may nonetheless convict the defendant, and he will have one less federal constitutional claim to assert in his federal habeas petition.[13] If the state trial judge admits the evidence in question after a full hearing, the federal habeas court pursuant to the 1966 amendment to § 2254 will gain significant guidance from the state ruling in this regard. Subtler considerations as well militate in favor of honoring a state contemporaneous-objection rule. An objection on the spot may force the prosecution to take a hard look at its hole card, and even if the prosecutor thinks that the state trial judge will admit the evidence he must contemplate the possibility of reversal by the state appellate courts or the ultimate issuance of a federal writ of habeas corpus based on the impropriety of the state court's rejection of the federal constitutional claim.

We think that the rule of *Fay* v. *Noia*, broadly stated, may encourage "sandbagging" on the part of defense lawyers, who may take their chances on a verdict of not guilty in a state trial court with the intent to raise their constitutional claims in a federal habeas court if their initial gamble does not pay off. The refusal of federal habeas courts to honor contemporaneous-objection rules may also make state courts themselves less stringent in their enforcement. Under the rule of *Fay* v. *Noia*, state appellate courts know that a federal constitutional issue raised for the first time in the proceeding before them may well be decided in any event by a federal *habeas* tribunal. Thus, their choice is between addressing the issue notwithstanding the petitioner's failure to timely object, or else face

---

[13] Responding to concerns such as these, MR. JUSTICE POWELL's concurring opinion last Term in *Estelle* v. *Williams*, 425 U. S. 501, 513 (1976), proposed an "inexcusable procedural default" test to bar the availability of federal habeas review where the substantive right claimed could have been safeguarded if the objection had been raised in a timely manner at trial.

the prospect that the federal habeas court will decide the question without the benefit of their views.

The failure of the federal habeas courts generally to require compliance with a contemporaneous-objection rule tends to detract from the perception of the trial of a criminal case in state court as a decisive and portentous event. A defendant has been accused of a serious crime, and this is the time and place set for him to be tried by a jury of his peers and found either guilty or not guilty by that jury. To the greatest extent possible all issues which bear on this charge should be determined in this proceeding: the accused is in the court-room, the jury is in the box, the judge is on the bench, and the witnesses, having been subpoenaed and duly sworn, await their turn to testify. Society's resources have been concentrated at that time and place in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens. Any procedural rule which encourages the result that those proceedings be as free of error as possible is thoroughly desirable, and the contemporaneous-objection rule surely falls within this classification.

We believe the adoption of the *Francis* rule in this situation will have the salutary effect of making the state trial on the merits the "main event," so to speak, rather than a "tryout on the road" for what will later be the determinative federal habeas hearing. There is nothing in the Constitution or in the language of § 2254 which requires that the state trial on the issue of guilt or innocence be devoted largely to the testimony of fact witnesses directed to the elements of the state crime, while only later will there occur in a federal habeas hearing a full airing of the federal constitutional claims which were not raised in the state proceedings. If a criminal defendant thinks that an action of the state trial court is about to deprive him of a federal constitutional right there is every reason for his following state procedure in making known his objection.

The "cause"-and-"prejudice" exception of the *Francis* rule

will afford an adequate guarantee, we think, that the rule will not prevent a federal habeas court from adjudicating for the first time the federal constitutional claim of a defendant who in the absence of such an adjudication will be the victim of a miscarriage of justice. Whatever precise content may be given those terms by later cases, we feel confident in holding without further elaboration that they do not exist here. Respondent has advanced no explanation whatever for his failure to object at trial,[14] and, as the proceeding unfolded, the trial judge is certainly not to be faulted for failing to question the admission of the confession himself. The other evidence of guilt presented at trial, moreover, was substantial to a degree that would negate any possibility of actual prejudice resulting to the respondent from the admission of his inculpatory statement.

We accordingly conclude that the judgment of the Court of Appeals for the Fifth Circuit must be reversed, and the cause remanded to the United States District Court for the Middle District of Florida with instructions to dismiss respondent's petition for a writ of habeas corpus.

*It is so ordered.*

MR. CHIEF JUSTICE BURGER, concurring.

I concur fully in the judgment and in the Court's opinion. I write separately to emphasize one point which, to me, seems of critical importance to this case. In my view, the

---

[14] In *Henry* v. *Mississippi*, 379 U. S., at 451, the Court noted that decisions of counsel relating to trial strategy, even when made without the consultation of the defendant, would bar direct federal review of claims thereby forgone, except where "the circumstances are exceptional."

Last Term in *Estelle* v. *Williams, supra,* the Court reiterated the burden on a defendant to be bound by the trial judgments of his lawyer. "Under our adversary system, once a defendant has the assistance of counsel the vast array of trial decisions, strategic and tactical, which must be made before and during trial rests with the accused and his attorney." 425 U. S., at 512.

"deliberate bypass" standard enunciated in *Fay* v. *Noia*, 372 U. S. 391 (1963), was never designed for, and is inapplicable to, errors—even of constitutional dimension—alleged to have been committed during trial.

In *Fay* v. *Noia*, the Court applied the "deliberate bypass" standard to a case where the critical procedural decision—whether to take a criminal appeal—was entrusted to a convicted defendant. Although Noia, the habeas petitioner, was represented by counsel, he himself had to make the decision whether to appeal or not; the role of the attorney was limited to giving advice and counsel. In giving content to the new deliberate-bypass standard, *Fay* looked to the Court's decision in *Johnson* v. *Zerbst*, 304 U. S. 458 (1938), a case where the defendant had been called upon to make the decision whether to request representation by counsel in his federal criminal trial. Because in both *Fay* and *Zerbst*, important rights hung in the balance of the *defendant's own decision*, the Court required that a waiver impairing such rights be a knowing and intelligent decision by the defendant himself. As *Fay* put it:

> "If a habeas applicant, after consultation with competent counsel or otherwise, understandingly and knowingly forewent the privilege of seeking to vindicate his federal claims in the state courts . . . then it is open to the federal court on habeas to deny him all relief . . . ." 372 U. S., at 439.

The touchstone of *Fay* and *Zerbst*, then, is the exercise of volition by the defendant himself with respect to his own federal constitutional rights. In contrast, the claim in the case before us relates to events during the trial itself. Typically, habeas petitioners claim that unlawfully secured evidence was admitted, but see *Stone* v. *Powell*, 428 U. S. 465 (1976), or that improper testimony was adduced, or that an improper jury charge was given, but see *Henderson* v. *Kibbe*, 431 U. S. 145, 157 (1977) (BURGER, C. J., concurring in judgment),

or that a particular line of examination or argument by the prosecutor was improper or prejudicial. But unlike *Fay* and *Zerbst,* preservation of this type of claim under state procedural rules does not generally involve an assertion by the defendant himself; rather, the decision to assert or not to assert constitutional rights or constitutionally based objections at trial is necessarily entrusted to the defendant's attorney, who must make on-the-spot decisions at virtually all stages of a criminal trial. As a practical matter, a criminal defendant is rarely, if ever, in a position to decide, for example, whether certain testimony is hearsay and, if so, whether it implicates interests protected by the Confrontation Clause; indeed, it is because " '[e]ven the intelligent and educated layman has small and sometimes no skill in the science of law' " that we held it constitutionally required that every defendant who faces the possibility of incarceration be afforded counsel. *Argersinger* v. *Hamlin,* 407 U. S. 25 (1972); *Gideon* v. *Wainwright,* 372 U. S. 335, 345 (1963).

Once counsel is appointed, the day-to-day conduct of the defense rests with the attorney. He, not the client, has the immediate—and ultimate—responsibility of deciding if and when to object, which witnesses, if any, to call, and what defenses to develop. Not only do these decisions rest with the attorney, but such decisions must, as a practical matter, be made without consulting the client.[1] The trial process simply does not permit the type of frequent and protracted interruptions which would be necessary if it were required that clients give knowing and intelligent approval to each of the myriad tactical decisions as a trial proceeds.[2]

---

[1] Only such basic decisions as whether to plead guilty, waive a jury, or testify in one's own behalf are ultimately for the accused to make. See ABA Project on Standards for Criminal Justice, The Prosecution Function and Defense Function § 5.2, pp. 237–238 (App. Draft 1971).

[2] One is left to wonder what use there would have been to an objection to a confession corroborated by witnesses who heard Sykes freely admit the killing at the scene within minutes after the shooting.

Since trial decisions are of necessity entrusted to the accused's attorney, the *Fay-Zerbst* standard of "knowing and intelligent waiver" is simply inapplicable. The dissent in this case, written by the author of *Fay* v. *Noia,* implicitly recognizes as much. According to the dissent, *Fay* imposes the knowing-and-intelligent-waiver standard "where possible" during the course of the trial. In an extraordinary modification of *Fay,* MR. JUSTICE BRENNAN would now require "that the lawyer actually exercis[e] his expertise and judgment in his client's service, and with his client's knowing and intelligent participation *where possible";* he does not intimate what guidelines would be used to decide when or under what circumstances this would actually be "possible." *Post,* at 116. (Emphasis supplied.) What had always been thought the standard governing the *accused's* waiver of his own constitutional rights the dissent would change, in the trial setting, into a standard of conduct imposed upon the defendant's *attorney.* This vague "standard" would be unmanageable to the point of impossibility.

The effort to read this expanded concept into *Fay* is to no avail; that case simply did not address a situation where the defendant had to look to his lawyer for vindication of constitutionally based interests. I would leave the core holding of *Fay* where it began, and reject this illogical uprooting of an otherwise defensible doctrine.

MR. JUSTICE STEVENS, concurring.

Although the Court's decision today may be read as a significant departure from the "deliberate bypass" standard announced in *Fay* v. *Noia,* 372 U. S. 391, I am persuaded that the holding is consistent with the way other federal courts have actually been applying *Fay.*[1] The notion that a client

---

[1] The suggestion in *Fay,* 372 U. S., at 439, that the decision must be made personally by the defendant has not fared well, see *United States ex rel. Cruz* v. *LaVallee,* 448 F. 2d 671, 679 (CA2 1971); *United States ex*

must always consent to a tactical decision not to assert a constitutional objection to a proffer of evidence has always seemed unrealistic to me.[2] Conversely, if the constitutional issue is sufficiently grave, even an express waiver by the defendant himself may sometimes be excused.[3] Matters such

---

*rel. Green* v. *Rundle,* 452 F. 2d 232, 236 (CA3 1971), although a decision by counsel may not be binding if made over the objection of the defendant, *Paine* v. *McCarthy,* 527 F. 2d 173, 175–176 (CA9 1975). Courts have generally found a "deliberate bypass" where counsel could reasonably have decided not to object, *United States ex rel. Terry* v. *Henderson,* 462 F. 2d 1125, 1129 (CA2 1972); *Whitney* v. *United States,* 513 F. 2d 326, 329 (CA8 1974); *United States ex rel. Broaddus* v. *Rundle,* 429 F. 2d 791, 795 (CA3 1970), but they have not found a bypass when they consider the right "deeply embedded" in the Constitution, *Frazier* v. *Roberts,* 441 F. 2d 1224, 1230 (CA8 1971), or when the procedural default was not substantial, *Minor* v. *Black,* 527 F. 2d 1, 5 n. 3 (CA6 1975); *Black* v. *Beto,* 382 F. 2d 758, 760 (CA5 1967). Sometimes, even a deliberate choice by trial counsel has been held not to be a "deliberate bypass" when the result would be unjust, *Moreno* v. *Beto,* 415 F. 2d 154 (CA5 1969). In short, the actual disposition of these cases seems to rest on the court's perception of the totality of the circumstances, rather than on mechanical application of the "deliberate bypass" test.

[2] "If counsel is to have the responsibility for conducting a contested criminal trial, quite obviously he must have the authority to make important tactical decisions promptly as a trial progresses. The very reasons why counsel's participation is of such critical importance in assuring a fair trial for the defendant, see *Powell* v. *Alabama,* 287 U. S. 45, 68–69, . . . make it inappropriate to require that his tactical decisions always be personally approved, or even thoroughly understood, by his client. Unquestionably, assuming the lawyer's competence, the client must accept the consequences of his trial strategy. A rule which would require the client's participation in every decision to object, or not to object, to proffered evidence would make a shambles of orderly procedure." *United States ex rel. Allum* v. *Twomey,* 484 F. 2d 740, 744–745 (CA7 1973).

[3] The test announced in *Fay* was not actually applied in that case. The Court held that habeas relief was available notwithstanding the client's participation in the waiver decision, and notwithstanding the fact that the decision was made on a tactical basis. The client apparently feared that the State might be able to convict him even without the use

as the competence of counsel, the procedural context in which the asserted waiver occurred, the character of the constitutional right at stake, and the overall fairness of the entire proceeding, may be more significant than the language of the test the Court purports to apply. I therefore believe the Court has wisely refrained from attempting to give precise content to its "cause"-and-"prejudice" exception to the rule of *Francis* v. *Henderson,* 425 U. S. 536.[4]

In this case I agree with the Court's holding that collateral attack on the state-court judgment should not be allowed. The record persuades me that competent trial counsel could well have made a deliberate decision not to object to the admission of the respondent's in-custody statement. That statement was consistent, in many respects, with the respondent's trial testimony. It even had some positive value, since it portrayed the respondent as having acted in response to provocation, which might have influenced the jury to return a verdict on a lesser charge.[5] To the extent that it was damaging, the primary harm would have resulted from its effect in impeaching the trial testimony, but it would have been admissible for impeachment in any event, *Harris* v. *New*

of his confession, and that he might be sentenced to death if reconvicted. See *Fay, supra,* at 397 n. 3, 440.

[4] As *Fay* v. *Noia, supra,* at 438, makes clear, we are concerned here with a matter of equitable discretion rather than a question of statutory authority; and equity has always been characterized by its flexibility and regard for the necessities of each case, cf. *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1, 15.

[5] According to the statement the respondent made to the police, the victim came into his trailer, picked up his shotgun, and played with it; they quarreled and the victim cut the respondent's hand with a knife; then the victim left the trailer and made an insulting gesture, at which time the respondent shot him. Other evidence established that respondent was quite drunk at the time. The primary difference between this and the respondent's trial testimony was that at trial the respondent testified that the victim had threatened him before leaving the trailer, and had turned and started toward the respondent just before the shooting.

*York,* 401 U. S. 222. Counsel may well have preferred to have the statement admitted without objection when it was first offered rather than making an objection which, at best,[6] could have been only temporarily successful.

Moreover, since the police fully complied with *Miranda,* the deterrent purpose of the *Miranda* rule is inapplicable to this case. Finally, there is clearly no basis for claiming that the trial violated any standard of fundamental fairness. Accordingly, no matter how the rule is phrased, this case is plainly not one in which a collateral attack should be allowed. I therefore join the opinion of the Court.

MR. JUSTICE WHITE, concurring in the judgment.

Under the Court's cases a state conviction will survive challenge in federal habeas corpus not only when there has been a deliberate bypass within the meaning of *Fay* v. *Noia,* 372 U. S. 391 (1963), but also when the alleged constitutional error is harmless beyond a reasonable doubt within the intendment of *Harrington* v. *California,* 395 U. S. 250 (1969), and similar cases. The petition for habeas corpus of respondent Sykes alleging the violation of his constitutional rights by the admission of certain evidence should be denied if the alleged error is deemed harmless. This would be true even had there been proper objection to the evidence and no procedural default whatsoever by either respondent or his counsel. *Milton* v. *Wainwright,* 407 U. S. 371 (1972).

It is thus of some moment to me that the Court makes its own assessment of the record and itself declares that the evidence of guilt in this case is sufficient to "negate any possibility of actual prejudice resulting to the respondent from the

---

[6] The objection was weak since the police officers gave the respondent the appropriate warnings. His claim that he was too intoxicated to understand the warnings is not only implausible, but also somewhat inconsistent with any attempt to give credibility to his trial testimony, which necessarily required recollection of the circumstances surrounding the shooting.

admission of his inculpatory statement." *Ante,* at 91. This appears to be tantamount to a finding of harmless error under the *Harrington* standard and is itself sufficient to foreclose the writ and to warrant reversal of the judgment.

This would seem to obviate consideration of whether, in the light of *Davis* v. *United States,* 411 U. S. 233 (1973), and *Francis* v. *Henderson,* 425 U. S. 536 (1976), the deliberate-bypass rule of *Fay* v. *Noia, supra,* should be further modified with respect to those occasions during trial where the defendant does not comply with the contemporaneous-objection rule when evidence is offered but later seeks federal habeas corpus, claiming that admitting the evidence violated his constitutional rights. The Court nevertheless deals at length with this issue, and it is not inappropriate for me to add the following comments.

In terms of the necessity for Sykes to show prejudice, it seems to me that the harmless-error rule provides ample protection to the State's interest. If a constitutional violation has been shown and there has been no deliberate bypass—at least as I understand that rule as applied to alleged trial lapses of defense counsel—I see little if any warrant, having in mind the State's burden of proof, not to insist upon a showing that the error was harmless beyond a reasonable doubt. As long as there is acceptable cause for the defendant's not objecting to the evidence, there should not be shifted to him the burden of proving specific prejudice to the satisfaction of the habeas corpus judge.

With respect to the necessity to show cause for noncompliance with the state rule, I think the deliberate-bypass rule of *Fay* v. *Noia* affords adequate protection to the State's interest in insisting that defendants not flout the rules of evidence. The bypass rule, however, as applied to events occurring during trial, cannot always demand that the defendant himself concur in counsel's judgment. Furthermore, if counsel is aware of the facts and the law (here the contemporaneous-

objection rule and the relevant constitutional objection that might be made) and yet decides not to object because he thinks the objection is unfounded, would damage his client's case, or for any other reason that flows from his exercise of professional judgment, there has been, as I see it, a deliberate bypass. It will not later suffice to allege in federal habeas corpus that counsel was mistaken, unless it is "plain error" appearing on the record or unless the error is sufficiently egregious to demonstrate that the services of counsel were not "within the range of competence demanded of attorneys in criminal cases." *McMann* v. *Richardson,* 397 U. S. 759, 771 (1970). Other reasons not amounting to deliberate bypass, such as ignorance of the applicable rules, would be sufficient to excuse the failure to object to evidence offered during trial.

I do agree that it is the burden of the habeas corpus petitioner to negative deliberate bypass and explain his failure to object. Sykes did neither here, and I therefore concur in the judgment.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL joins, dissenting.

Over the course of the last decade, the deliberate-bypass standard announced in *Fay* v. *Noia,* 372 U. S. 391, 438–439 (1963), has played a central role in efforts by the federal judiciary to accommodate the constitutional rights of the individual with the States' interests in the integrity of their judicial procedural regimes. The Court today decides that this standard should no longer apply with respect to procedural defaults occurring during the trial of a criminal defendant. In its place, the Court adopts the two-part "cause"-and-"prejudice" test originally developed in *Davis* v. *United States,* 411 U. S. 233 (1973), and *Francis* v. *Henderson,* 425 U. S. 536 (1976). As was true with these earlier cases,[1]

---

[1] The Court began its retreat from the deliberate-bypass standard of *Fay* in *Davis* v. *United States,* where a congressional intent to restrict

however, today's decision makes no effort to provide concrete guidance as to the content of those terms. More particularly, left unanswered is the thorny question that must be recognized to be central to a realistic rationalization of this area of law: How should the federal habeas court treat a procedural default in a state court that is attributable purely and simply to the error or negligence of a defendant's trial counsel? Because this key issue remains unresolved, I shall attempt in this opinion a re-examination of the policies[2] that should

the bypass formulation with respect to collateral review under 28 U. S. C. § 2255 was found to inhere in Fed. Rule Crim. Proc. 12 (b) (2). By relying upon Congress' purported intent, *Davis* managed to evade any consideration of the justifications and any shortcomings of the bypass test. Subsequently, in *Francis* v. *Henderson,* a controlling congressional expression of intent no longer was available, and the Court therefore employed the shibboleth of "considerations of comity and federalism" to justify application of *Davis* to a § 2254 proceeding. 425 U. S., at 541. Again, any coherent analysis of the bypass standard or the waivability of constitutional rights was avoided—as it was that same day in *Estelle* v. *Williams,* 425 U. S. 501 (1976), which proceeded to find a surrender of a constitutional right in an opinion that was simply oblivious to some 40 years of existing case law. See *infra,* at 108–109. Thus, while today's opinion follows from *Davis, Francis,* and *Estelle,* the entire edifice is a mere house of cards whose foundation has escaped any systematic inspection.

[2] I use the term "policies" advisedly, for it is important to recognize the area of my disagreement with the Court. This Court has never taken issue with the foundation principle established by *Fay* v. *Noia*—that in considering a petition for the writ of habeas corpus, federal courts possess the *power* to look beyond a state procedural forfeiture in order to entertain the contention that a defendant's constitutional rights have been abridged. 372 U. S., at 398–399. Indeed, only last Term, the Court reiterated: "There can be no question of a federal district court's power to entertain an application for a writ of habeas corpus in a case such as this." *Francis* v. *Henderson,* 425 U. S., at 538. Today's decision reconfirms this federal power by authorizing federal intervention under the "cause"-and-"prejudice" test. Were such power unavailable, federal courts would be bound by Fla. Rule Crim. Proc. 3.190, which contains no explicit provision for relief from procedural defaults. Our disagreement, there-

inform—and in *Fay* did inform—the selection of the standard governing the availability of federal habeas corpus jurisdiction in the face of an intervening procedural default in the state court.

## I

I begin with the threshold question: What is the meaning and import of a procedural default? If it could be assumed that a procedural default more often than not is the product of a defendant's conscious refusal to abide by the duly constituted, legitimate processes of the state courts, then I might agree that a regime of collateral review weighted in favor of a State's procedural rules would be warranted.[3] *Fay,* however, recognized that such rarely is the case; and therein lies *Fay*'s basic unwillingness to embrace a view of habeas jurisdiction that results in "an airtight system of [procedural] forfeitures." 372 U. S., at 432.

This, of course, is not to deny that there are times when the failure to heed a state procedural requirement stems from an intentional decision to avoid the presentation of constitutional claims to the state forum. *Fay* was not insensitive to this possibility. Indeed, the very purpose of its bypass test is to detect and enforce such intentional procedural

---

fore, centers upon the standard that should govern a federal district court in the exercise of this power to adjudicate the constitutional claims of a state prisoner—which, in turn, depends upon an evaluation of the competing policies and values served by collateral review weighted against those furthered through strict deference to a State's procedural rules.

It is worth noting that because we deal with the standards governing the exercise of the conceded power of federal habeas courts to excuse a state procedural default, Congress, as the primary expositor of federal-court jurisdiction, remains free to undo the potential restrictiveness of today's decision by expressly defining the standard of intervention under 28 U. S. C. § 2254. Cf. *Davis* v. *United States,* 411 U. S., at 241–242.

[3] Even this concession to procedure would, in my view, be unnecessary so long as the habeas court is capable of distinguishing between intentional and inadvertent defaults with acceptable accuracy—as I believe it can. See n. 4, *infra.*

forfeitures of outstanding constitutionally based claims. *Fay* does so through application of the longstanding rule used to test whether action or inaction on the part of a criminal defendant should be construed as a decision to surrender the assertion of rights secured by the Constitution: To be an effective waiver, there must be "an intentional relinquishment or abandonment of a known right or privilege." *Johnson* v. *Zerbst,* 304 U. S. 458, 464 (1938). Incorporating this standard, *Fay* recognized that if one "understandingly and knowingly forewent the privilege of seeking to vindicate his federal claims in the state courts, whether for strategic, tactical or any other reasons that can fairly be described as the deliberate by-passing of state procedures, then it is open to the federal court on habeas to deny him all relief . . . ." 372 U. S., at 439. For this reason, the Court's assertion that it "think[s]" that the *Fay* rule encourages intentional "sandbagging" on the part of the defense lawyers is without basis, *ante,* at 89; certainly the Court points to no cases or commentary arising during the past 15 years of actual use of the *Fay* test to support this criticism. Rather, a consistent reading of case law demonstrates that the bypass formula has provided a workable vehicle for protecting the integrity of state rules in those instances when such protection would be both meaningful and just.[4]

---

[4] Over the years this Court has without notable difficulty applied the *Fay* rule to a variety of contexts. *E. g., Lefkowitz* v. *Newsome,* 420 U. S. 283 (1975); *Humphrey* v. *Cady,* 405 U. S. 504, 517 (1972); *Anderson* v. *Nelson,* 390 U. S. 523, 525 (1968); *Warden* v. *Hayden,* 387 U. S. 294, 297 n. 3 (1967); cf. *Chambers* v. *Mississippi,* 410 U. S. 284, 290 n. 3 (1973). Similarly, the standard has been capable of intelligent application by the lower federal courts in order to bar the collateral reconsideration of tactical decisions by the defense, *e. g., United States ex rel. Green* v. *Rundle,* 452 F. 2d 232, 236 (CA3 1971) (counsel concedes tactical decision); *Whitney* v. *United States,* 513 F. 2d 326, 329 (CA8 1974) (counsel forgoes challenge to seized evidence in order to avoid concession of any possessory interest in searched premises), while otherwise permitting federal review, *Henderson* v. *Kibbe,* 534 F. 2d 493, 496–497 (CA2 1976), rev'd

But having created the bypass exception to the availability of collateral review, *Fay* recognized that intentional, tactical forfeitures are not the norm upon which to build a rational system of federal habeas jurisdiction. In the ordinary case, litigants simply have no incentive to slight the state tribunal, since constitutional adjudication on the state and federal levels are not mutually exclusive. *Brown* v. *Allen,* 344 U. S. 443 (1953); *Brewer* v. *Williams,* 430 U. S. 387 (1977); *Castaneda* v. *Partida,* 430 U. S. 482 (1977). Under the regime of collateral review recognized since the days of *Brown* v. *Allen,* and enforced by the *Fay* bypass test, no rational lawyer would risk the "sandbagging" feared by the Court.[5] If a constitutional challenge is not properly raised

on other grounds, 431 U. S. 145 (1977); *Paine* v. *McCarthy,* 527 F. 2d 173 (CA9 1975). And in cases similar to the present one where Fifth Amendment violations were in issue, *Fay* has afforded a meaningful standard governing the scope of federal collateral review. Compare *United States ex rel. Terry* v. *Henderson,* 462 F. 2d 1125, 1129 (CA2 1972) (bypass found where counsel relied on confession to rebut premeditation in murder trial); and *United States ex rel. Cruz* v. *LaVallee,* 448 F. 2d 671, 679 (CA2 1971) (bypass found where trial strategy called for confessing to killing but arguing that mitigating circumstances exist), with *Moreno* v. *Beto,* 415 F. 2d 154 (CA5 1969) (defense not held to bypass where defense counsel deliberately chose not to raise and submit voluntariness issue to jury due to unwillingness to expose client to unconstitutional procedure).

[5] In brief, the defense lawyer would face two options: (1) He could elect to present his constitutional claims to the state courts in a proper fashion. If the state trial court is persuaded that a constitutional breach has occurred, the remedies dictated by the Constitution would be imposed, the defense would be bolstered, and the prosecution accordingly weakened, perhaps precluded altogether. If the state court rejects the properly tendered claims, the defense has lost nothing: Appellate review before the state courts and federal habeas consideration are preserved. (2) He could elect to "sandbag." This presumably means, first, that he would hold back the presentation of his constitutional claim to the trial court, thereby increasing the likelihood of a conviction since the prosecution would be able to present evidence that, while arguably constitutionally deficient, may be highly prejudicial to the defense. Second, he would thereby have forfeited all state review and remedies with respect to these claims (sub-

on the state level, the explanation generally will be found elsewhere than in an intentional tactical decision.

In brief then, any realistic system of federal habeas corpus jurisdiction must be premised on the reality that the ordinary procedural default is born of the inadvertence, negligence, inexperience, or incompetence of trial counsel. See, e. g., Hill, The Inadequate State Ground, 65 Colum. L. Rev. 943, 997 (1965). The case under consideration today is typical. The Court makes no effort to identify a tactical motive for the failure of Sykes' attorney to challenge the admissibility or reliability of a highly inculpatory statement. While my Brother STEVENS finds a possible tactical advantage, I agree with the Court of Appeals that this reading is most implausible: "We can find no possible advantage which the defense might have gained, or thought they might gain, from the failure to conform with Florida Criminal Procedure Rule 3.190 (i)." 528 F. 2d 522, 527 (1976). Indeed, there is no basis for inferring that Sykes or his state trial lawyer was even aware of the existence of his claim under the Fifth Amendment; for this is not a case where the trial judge expressly drew the attention of the defense to a possible constitutional contention or procedural requirement, e. g., Murch v. Mottram, 409 U. S. 41 (1972); cf. Henry v. Mississippi, 379 U. S. 443, 448 n. 3 (1965), or where the defense signals its knowledge of a constitutional claim by abandoning a challenge previously raised, e. g., Sanders v. United States, 373 U. S. 1,

---

ject to whatever "plain error" rule is available). Third, to carry out his scheme, he would now be compelled to deceive the federal habeas court and to convince the judge that he did not "deliberately bypass" the state procedures. If he loses on this gamble, all federal review would be barred, and his "sandbagging" would have resulted in nothing but the forfeiture of all judicial review of his client's claims. The Court, without substantiation, apparently believes that a meaningful number of lawyers are induced into option 2 by Fay. I do not. That belief simply offends common sense.

18 (1963). Rather, any realistic reading of the record demonstrates that we are faced here with a lawyer's simple error.[6]

*Fay*'s answer thus is plain: the bypass test simply refuses to credit what is essentially a lawyer's mistake as a forfeiture of constitutional rights. I persist in the belief that the interests of Sykes and the State of Florida are best rationalized by adherence to this test, and by declining to react to inadvertent defaults through the creation of an "airtight system of forfeitures."

## II

What are the interests that Sykes can assert in preserving the availability of federal collateral relief in the face of his inadvertent state procedural default? Two are paramount.

As is true with any federal habeas applicant, Sykes seeks access to the federal court for the determination of the validity of his federal constitutional claim. Since at least *Brown* v. *Allen,* it has been recognized that the "fair effect [of] the habeas corpus jurisdiction as enacted by Congress" entitles a state prisoner to such federal review. 344 U. S., at 500 (opinion of Frankfurter, J.). While some of my Brethren may feel uncomfortable with this congressional choice of policy, see, *e. g., Stone* v. *Powell,* 428 U. S. 465 (1976), the Legislative Branch nonetheless remains entirely free to determine that the constitutional rights of an individual subject to state custody, like those of the civil rights

---

[6] The likelihood that we are presented with a lawyer's simple mistake is not answered by respondent's stipulation to his trial counsel's competency. At oral argument it was made clear that Sykes so stipulated solely because of the position expressed by the habeas court that a challenge to his prior legal representation would require the return to the state courts and the further exhaustion of state remedies, a detour that respondent insisted on avoiding. Tr. of Oral Arg. 49. Furthermore, in light of the prevailing standards, or lack of standards, for judging the competency of trial counsel, see *infra,* at 117, it is perfectly consistent for even a lawyer who commits a grievous error—whether due to negligence or ignorance—to be deemed to have provided competent representation.

plaintiff suing under 42 U. S. C. § 1983, are best preserved by "interpos[ing] the federal courts between the States and the people, as guardians of the people's federal rights . . . ." *Mitchum* v. *Foster,* 407 U. S. 225, 242 (1972).

With respect to federal habeas corpus jurisdiction, Congress explicitly chose to effectuate the federal court's primary responsibility for preserving federal rights and privileges by authorizing the litigation of constitutional claims and defenses in a district court after the State vindicates its own interest through trial of the substantive criminal offense in the state courts.[7] This, of course, was not the only course that Congress might have followed: As an alternative, it might well have decided entirely to circumvent all state procedure through the expansion of existing federal removal statutes such as 28 U. S. C. §§ 1442 (a)(1) and 1443, thereby authorizing the pretrial transfer of all state criminal cases to the federal courts whenever federal defenses or claims are in issue.[8] But liberal post-trial federal review is the redress

---

[7] Congress' grant of post-trial access to the federal courts was reconfirmed by its modification of 28 U. S. C. § 2254 following our decisions in *Fay* and *Townsend* v. *Sain,* 372 U. S. 293 (1963). This legislative amendment of the habeas statute essentially embraced the relitigation standards outlined in *Townsend* without altering the broad framework for collateral review contained in *Brown* v. *Allen,* 344 U. S. 443 (1953), *Fay,* and like cases. See, *e. g., Stone* v. *Powell,* 428 U. S. 465, 528–529 (1976) (BRENNAN, J., dissenting).

[8] Whether in a civil or criminal case, Congress' broad authority to allocate federal issues for decision in its choice of forum is clear. See, *e. g., Tennessee* v. *Davis,* 100 U. S. 257 (1880); *Greenwood* v. *Peacock,* 384 U. S. 808, 833 (1966): "We have no doubt that Congress, if it chose, could provide for exactly such a system. We may assume that Congress has constitutional power to provide that all federal issues be tried in the federal courts, that all be tried in the courts of the States, or that jurisdiction of such issues be shared. And in the exercise of that power, we may assume that Congress is constitutionally fully free to establish the conditions under which civil or criminal proceedings involving federal issues may be removed from one court to another." The same day as *Greenwood* the Court applied § 1443 (1) as authorizing (subject to further fact-

that Congress ultimately chose to allow and the consequences of a state procedural default should be evaluated in conformance with this policy choice. Certainly, we can all agree that once a state court has assumed jurisdiction of a criminal case, the integrity of its own process is a matter of legitimate concern. The *Fay* bypass test, by seeking to discover intentional abuses of the rules of the state forum, is, I believe, compatible with this state institutional interest. See Part III, *infra*. But whether *Fay* was correct in penalizing a litigant solely for his intentional forfeitures properly must be read in light of Congress' desired norm of widened post-trial access to the federal courts. If the standard adopted today is later construed to require that the simple mistakes of attorneys are to be treated as binding forfeitures, it would serve to subordinate the fundamental rights contained in our constitutional charter to inadvertent defaults of rules promulgated by state agencies, and would essentially leave it to the States, through the enactment of procedure and the certification of the competence of local attorneys, to determine whether a habeas applicant will be permitted the access to the federal forum that is guaranteed him by Congress.[9]

---

finding) the removal of a state trespass prosecution to the United States District Court. *Georgia* v. *Rachel*, 384 U. S. 780 (1966). Once a criminal case is thus removed to the federal court, the State no longer can assert any interest in having trial of the state substantive offense governed by the State's choice of procedure, for this Court has long provided that federal procedure then obtains. *Tennessee* v. *Davis, supra,* at 272. In this sense, the prevailing system of post-trial federal collateral review is more generous to state procedure than would be required, and, some would say, desired. See generally Amsterdam, Criminal Prosecutions Affecting Federally Guaranteed Civil Rights: Federal Removal and Habeas Corpus Jurisdiction to Abort State Court Trial, 113 U. Pa. L. Rev. 793 (1965).

[9] Of course, even under the Court's new standard, traditional principles continue to apply, and the federal judiciary is not bound by state rules of procedure that are unreasonable on their face, or that are either unrea-

Thus, I remain concerned that undue deference to local procedure can only serve to undermine the ready access to a federal court to which a state defendant otherwise is entitled. But federal review is not the full measure of Sykes' interest, for there is another of even greater immediacy: assuring that his constitutional claims can be addressed to *some* court. For the obvious consequence of barring Sykes from the federal courthouse is to insulate Florida's alleged constitutional violation from any and all judicial review because of a lawyer's mistake. From the standpoint of the habeas petitioner, it is a harsh rule indeed that denies him "any review at all where the state has granted none," *Brown* v. *Allen,* 344 U. S., at 552 (Black, J., dissenting)—particularly when he would have enjoyed both state and federal consideration had his attorney not erred.

*Fay's* answer to Sykes' predicament, measuring the existence and extent of his procedural waiver by the *Zerbst* standard is, I submit, a realistic one. The Fifth Amendment assures that no person "shall be compelled in any criminal case to be a witness against himself . . . ." A defendant like Sykes can forgo this protection in two ways: He may decide to waive his substantive self-incrimination right at the point that he gives an inculpatory statement to the police authorities, *Miranda* v. *Arizona,* 384 U. S. 436, 478 (1966), or he and his attorney may choose not to challenge the admissibility of an incriminating statement when such a challenge would be effective under state trial procedure. See *Estelle* v. *Williams,* 425 U. S. 501, 524 (1976) (dissenting opinion). With few exceptions in the past 40 years, *e. g., Estelle* v. *Williams, supra; Schneckloth* v. *Bustamonte,* 412 U. S. 218 (1973), this Court has required that the substantive waiver, to be valid, must be a knowing and intelligent one.

sonably or inconsistently applied. See, *e. g., Henry* v. *Mississippi,* 379 U. S. 443 (1965); *NAACP* v. *Alabama,* 377 U. S. 288 (1964); *Staub* v. *Baxley,* 355 U. S. 313 (1958); *Williams* v. *Georgia,* 349 U. S. 375 (1955).

See, *e. g., Brewer* v. *Williams,* 430 U. S., at 404; *Brookhart* v. *Janis,* 384 U. S. 1, 4 (1966); *Escobedo* v. *Williams,* 378 U. S. 478, 490 n. 14 (1964); *Green* v. *United States,* 355 U. S. 184, 191–192 (1957); *Smith* v. *United States,* 337 U. S. 137, 149–150 (1949); *Adams* v. *United States ex rel. McCann,* 317 U. S. 269, 275 (1942). It has long been established that such is the case for the waiver of the protections of the *Miranda* rule. See 384 U. S., at 475; *Schneckloth* v. *Bustamonte, supra,* at 240. *Fay* simply evaluates the procedural waiver of Sykes' Fifth Amendment rights by the same standard.

From the standpoint of the habeas petitioner this symmetry is readily understandable. To him, the inevitable consequence of either type of forfeiture—be it substantive or procedural—is that the protection of the Fifth Amendment is lost and his own words are introduced at trial to the prejudice of his defense. The defendant's vital interest in preserving his Fifth Amendment privilege entitles him to informed and intelligent consideration of any decision leading to its forfeiture. It may be, of course, that the State's countervailing institutional interests are more compelling in the case of eliciting a procedural default, thereby justifying a relaxation of the *Zerbst* standard. I discuss this possibility in greater detail in Part III, *infra.* It is sufficient for present purposes, however, that there is no reason for believing that this necessarily is true. That the State legitimately desires to preserve an orderly and efficient judicial process is undeniable. But similar interests of efficiency and the like also can be identified with respect to other state institutions, such as its law enforcement agencies. Yet, as was only recently reconfirmed, we would not permit and have not permitted the state police to enhance the orderliness and efficiency of their law enforcement activities by embarking on a campaign of acquiring inadvertent waivers of important constitutional rights. *Brewer* v. *Williams, supra,* at 401–406; see generally *Francis* v. *Henderson,* 425 U. S., at 548–549, n. 2 (dissenting opinion).

A procedural default should be treated accordingly. Indeed, a recent development in the law of habeas corpus suggests that adherence to the deliberate-bypass test may be more easily justified today than it was when *Fay* was decided. It also suggests that the "prejudice" prong of the Court's new test may prove to be a redundancy. Last Term the Court ruled that alleged violations of the Fourth Amendment in most circumstances no longer will be cognizable in habeas corpus. *Stone* v. *Powell*, 428 U. S. 465 (1976). While, for me, the principle that generated this conclusion was not readily apparent, I expressed my concern that the *Stone* decision contains the seeds for the exclusion from collateral review of a variety of constitutional rights that my Brethren somehow deem to be unimportant—perhaps those that they are able to conclude are not "guilt-related." See *id.*, at 517–518 (dissenting opinion). If this trail is to be followed, it would be quite unthinkable that an unintentional procedural default should be allowed to stand in the way of vindication of constitutional rights bearing upon the guilt or innocence of a defendant. Indeed, if as has been argued, a key to decision in this area turns upon a comparison of the importance of the constitutional right at stake with the state procedural rule, Sandalow, Henry v. Mississippi and the Adequate State Ground: Proposals for a Revised Doctrine, 1965 Sup. Ct. Rev. 187, 236–237, then the Court's threshold effort to identify those rights of sufficient importance to be litigated collaterally should largely predetermine the outcome of this balance.

In sum, I believe that *Fay*'s commitment to enforcing intentional but not inadvertent procedural defaults offers a realistic measure of protection for the habeas corpus petitioner seeking federal review of federal claims that were not litigated before the State. The threatened creation of a more "airtight system of forfeitures" would effectively deprive habeas petitioners of the opportunity for litigating

their constitutional claims before any forum and would disparage the paramount importance of constitutional rights in our system of government. Such a restriction of habeas corpus jurisdiction should be countenanced, I submit, only if it fairly can be concluded that *Fay*'s focus on knowing and voluntary forfeitures unduly interferes with the legitimate interests of state courts or institutions. The majority offers no suggestion that actual experience has shown that *Fay*'s bypass test can be criticized on this score. And, as I now hope to demonstrate, any such criticism would be unfounded.

## III

A regime of federal habeas corpus jurisdiction that permits the reopening of state procedural defaults does not invalidate any state procedural rule as such; [10] Florida's courts remain entirely free to enforce their own rules as they choose, and to deny any and all state rights and remedies to a defendant who fails to comply with applicable state procedure. The relevant inquiry is whether more is required—specifically, whether the fulfillment of important interests of the State necessitates that federal courts be called upon to impose additional sanctions for inadvertent noncompliance with state procedural requirements such as the contemporaneous-objection rule involved here.

---

[10] This is not to suggest that the availability of collateral review has no bearing on the States' selection and enforcement of procedural requirements. On the contrary, to the extent that a State desires to have input into the process of developing federal law, and seeks to guarantee its primary factfinding role as authorized by § 2254 and *Townsend* v. *Sain*, 372 U. S. 293 (1963), the existence of broad federal habeas power will tend to encourage the liberalizing and streamlining of state rules that otherwise might serve to bar such state participation. From every perspective, I would suppose that any such effect of *Fay* would be considered a salutary one, see, *e. g.*, Shapiro, Federal Habeas Corpus: A Study in Massachusetts, 87 Harv. L. Rev. 321, 348 (1973), although the Court implies the contrary, *ante*, at 89–90.

Florida, of course, can point to a variety of legitimate interests in seeking allegiance to its reasonable procedural requirements, the contemporaneous-objection rule included. See *Henry* v. *Mississippi,* 379 U. S., at 448. As *Fay* recognized, a trial, like any organized activity, must conform to coherent process, and "there must be sanctions for the flouting of such procedure." 372 U. S., at 431. The strict enforcement of procedural defaults, therefore, may be seen as a means of deterring any tendency on the part of the defense to slight the state forum, to deny state judges their due opportunity for playing a meaningful role in the evolving task of constitutional adjudication, or to mock the needed finality of criminal trials. All of these interests are referred to by the Court in various forms.[11]

The question remains, however, whether any of these policies or interests are efficiently and fairly served by enforcing both intentional and inadvertent defaults pursuant to the identical stringent standard. I remain convinced that when one pierces the surface justifications for a harsher rule posited by the Court, no standard stricter than *Fay*'s deliberate-bypass test is realistically defensible.

---

[11] In my view, the strongest plausible argument for strict enforcement of a contemporaneous-objection rule is one that the Court barely relies on at all: the possibility that the failure of timely objection to the admissibility of evidence may foreclose the making of a fresh record and thereby prejudice the prosecution in later litigation involving that evidence. There may be force to this contention, but it rests on the premise that the State in fact has suffered actual prejudice because of a procedural lapse. Florida demonstrates no such injury here. Sykes' trial occurred in June 1972. He subsequently filed his petition for a writ of habeas corpus in April 1973, thereby apprising Florida of his constitutional objection. There is no basis in the record for concluding that lost evidence or other form of prejudice, see, *e. g., Barker* v. *Wingo,* 407 U. S. 514, 532 (1972), arising during this 10½-month interval effectively forestalls Florida's defense of the Fifth Amendment claim or the reprosecution of Sykes should his constitutional challenge prevail.

Punishing a lawyer's unintentional errors by closing the federal courthouse door to his client is both a senseless and misdirected method of deterring the slighting of state rules. It is senseless because unplanned and unintentional action of any kind generally is not subject to deterrence; and, to the extent that it is hoped that a threatened sanction addressed to the defense will induce greater care and caution on the part of trial lawyers, thereby forestalling negligent conduct or error, the potential loss of all valuable state remedies would be sufficient to this end.[12] And it is a misdirected sanction because even if the penalization of incompetence or carelessness will encourage more thorough legal training and trial preparation, the habeas applicant, as opposed to his lawyer, hardly is the proper recipient of such a penalty. Especially with fundamental constitutional rights

---

[12] Under § 2254, the availability of federal review is not limited or dependent on forgoing litigation in the state courts. Because the state forum thus affords purely an additional measure of protection, *Fay* recognized: "A man under conviction for crime has an obvious inducement to do his very best to keep his state remedies open, and not stake his all on the outcome of a federal habeas proceeding which, in many respects, may be less advantageous to him than a state court proceeding. . . . And if because of inadvertence or neglect he runs afoul of a state procedural requirement, and thereby forfeits his state remedies, appellate and collateral, as well as direct review thereof in this Court, those consequences should be sufficient to vindicate the State's valid interest in orderly procedure." 372 U. S., at 433. See Reitz, Federal Habeas Corpus: Impact of an Abortive State Proceeding, 74 Harv. L. Rev. 1315, 1351 (1961). This Court's recent decision in *Stone* v. *Powell*, 428 U. S. 465 (1976), seems to subscribe to a similar view that deterrence is not meaningfully furthered by adopting an overkill of sanctions. There the Court reasoned that police misconduct under the Fourth Amendment will be deterred by state review of any search-and-seizure claim, and that further federal-court consideration would have but an "incremental" and "isolated" deterrent impact. *Id.*, at 494. Assuming that criminal defendants and lawyers are no less rational than police, they should be deterred from risking the unnecessary forfeiture of all state remedies and the initial opportunity for judicial victory before the state courts.

at stake, no fictional relationship of principal-agent or the like can justify holding the criminal defendant accountable for the naked errors of his attorney.[13] This is especially true when so many indigent defendants are without any realistic choice in selecting who ultimately represents them at trial.[14] Indeed, if responsibility for error must be apportioned between the parties, it is the State, through its attorney's admissions and certification policies, that is more fairly held to blame for the fact that practicing lawyers too often are ill-prepared or ill-equipped to act carefully and knowledgeably when faced with decisions governed by state procedural requirements.

---

[13] Traditionally, the rationale for binding a criminal defendant by his attorney's mistakes has rested on notions akin to agency law. See, *e. g.*, Comment, Criminal Waiver: The Requirements of Personal Participation, Competence and Legitimate State Interest, 54 Calif. L. Rev. 1262, 1278–1281 (1966). With respect to ordinary commercial matters, the common law established and recognized principal-agent relationships for the protection of innocent third parties who deal with the latter. In the context of a criminal trial, this analogy is not apt, for the State, primarily in control of the criminal process and responsible for qualifying and assigning attorneys to represent the accused, is not a wholly innocent bystander. Consequently, the dominant relationship of the trial counsel with respect to his client more recently has been found simply to inhere in "our legal system" or "our adversary system." *Estelle* v. *Williams*, 425 U. S., at 512. There is undoubted truth in this; obviously "our legal system" presupposes that attorneys will function competently, that their clients cannot participate in all decisions, *Henry* v. *Mississippi*, 379 U. S., at 451, and that the trial of a criminal defendant will not inevitably be followed by a trial of his attorney's performance. *Fay* reacts to this institutional demand by enforcing both action and inaction of attorneys—even if they prove to backfire in actual practice—provided that it is found that the lawyer was aware of his client's rights and knowingly applied his professional judgment in his client's behalf. In brief, the bypass test rightfully defers to the attorney's "vast array of trial decisions, strategic and tactical," *Estelle* v. *Williams, supra*, at 512, but not to sheer inadvertence where no decision was made.

[14] See generally Tague, An Indigent's Right to the Attorney of His Choice, 27 Stan. L. Rev. 73 (1974).

Hence, while I can well agree that the proper functioning of our system of criminal justice, both federal and state, necessarily places heavy reliance on the professionalism and judgment of trial attorneys, I cannot accept a system that ascribes the absolute forfeiture of an individual's constitutional claims to situations where his lawyer manifestly exercises *no* professional judgment at all—where carelessness, mistake, or ignorance is the explanation for a procedural default. Of course, it is regrettable that certain errors that might have been cured earlier had trial counsel acted expeditiously must be corrected collaterally and belatedly. I can understand the Court's wistfully wishing for the day when the trial was the sole, binding and final "event" of the adversarial process—although I hesitate to agree that in the eyes of the criminal defendant it has ever ceased being the "main" one, *ante,* at 90. But it should be plain that in the real world, the interest in finality is repeatedly compromised in numerous ways that arise with far greater frequency than do procedural defaults. The federal criminal system, to take one example, expressly disapproves of interlocutory review in the generality of cases even though such a policy would foster finality by permitting the authoritative resolution of all legal and constitutional issues prior to the convening of the "main event." See generally *Abney* v. *United States,* 431 U. S. 651 (1977). Instead, it relies on the belated correction of error, through appeal and collateral review, to ensure the fairness and legitimacy of the criminal sanction. Indeed, the very existence of the well-established right collaterally to reopen issues previously litigated before the state courts, *Brown* v. *Allen,* 344 U. S. 443 (1953), represents a congressional policy choice that is inconsistent with notions of strict finality—and probably more so than authorizing the litigation of issues that, due to inadvertence, were never addressed to any court. Ultimately, all of these limitations on the finality of criminal convictions emerge from the tension between justice

and efficiency in a judicial system that hopes to remain true to its principles and ideals. Reasonable people may disagree on how best to resolve these tensions. But the solution that today's decision risks embracing seems to me the most unfair of all: the denial of any judicial consideration of the constitutional claims of a criminal defendant because of errors made by his attorney which lie outside the power of the habeas petitioner to prevent or deter and for which, under no view of morality or ethics, can he be held responsible.

In short, I believe that the demands of our criminal justice system warrant visiting the mistakes of a trial attorney on the head of a habeas corpus applicant only when we are convinced that the lawyer actually exercised his expertise and judgment in his client's service, and with his client's knowing and intelligent participation where possible. This, of course, is the precise system of habeas review established by *Fay* v. *Noia.*

## IV

Perhaps the primary virtue of *Fay* is that the bypass test at least yields a coherent yardstick for federal district courts in rationalizing their power of collateral review. See n. 4, *supra.* In contrast, although some four years have passed since its introduction in *Davis* v. *United States,* 411 U. S. 233 (1973), the only thing clear about the Court's "cause"-and-"prejudice" standard is that it exhibits the notable tendency of keeping prisoners in jail without addressing their constitutional complaints. Hence, as of today, all we know of the "cause" standard [15] is its requirement that habeas applicants bear an undefined burden of explanation for the failure to obey the state rule, *ante,* at 91. Left unresolved is whether a habeas petitioner like Sykes can adequately discharge this burden by

---

[15] The earlier cases of *Davis* v. *United States,* 411 U. S. 233 (1973), and *Francis* v. *Henderson,* 425 U. S., at 542, similarly are not instructive in defining "cause," since both decisions appear to have disposed of the habeas application primarily on the "prejudice" aspect of the test.

offering the commonplace and truthful explanation for his default: attorney ignorance or error beyond the client's control. The "prejudice" inquiry, meanwhile, appears to bear a strong resemblance to harmless-error doctrine. Compare *ante,* at 91, with *Chapman* v. *California,* 386 U. S. 18, 24 (1967). I disagree with the Court's appraisal of the harmlessness of the admission of respondent's confession, but if this is what is meant by prejudice, respondent's constitutional contentions could be as quickly and easily disposed of in this regard by permitting federal courts to reach the merits of his complaint. In the absence of a persuasive alternative formulation to the bypass test, I would simply affirm the judgment of the Court of Appeals and allow Sykes his day in court on the ground that the failure of timely objection in this instance was not a tactical or deliberate decision but stemmed from a lawyer's error that should not be permitted to bind his client.

One final consideration deserves mention. Although the standards recently have been relaxed in various jurisdictions,[16] it is accurate to assert that most courts, this one included,[17] traditionally have resisted any realistic inquiry into the competency of trial counsel. There is nothing unreasonable,

---

[16] A majority of courts have now passed beyond the standard of attorney competence embodied in the so-called "mockery" test, which abdicates any judicial supervision over attorney performance so long as the attorney does not make a farce of the trial. See, *e. g., United States* v. *Katz,* 425 F. 2d 928 (CA2 1970) (attorney who was prone to fall asleep during trial held to have provided competent representation). The new emerging rule essentially requires that the attorney provide assistance within a reasonable range of professional competence, see *United States* v. *DeCoster,* 159 U. S. App. D. C. 326, 487 F. 2d 1197 (1973); *United States ex rel. Williams* v. *Twomey,* 510 F. 2d 634, 640, (CA7 1975).

[17] See, *e. g., Chambers* v. *Maroney,* 399 U. S. 42, 55–60 (1970) (Harlan, J., dissenting). Recently, this Court, however, has made clear that attorneys are expected to perform "within the range of competence demanded of attorneys in criminal cases," *McMann* v. *Richardson,* 397 U. S. 759, 771 (1970); *Tollett* v. *Henderson,* 411 U. S. 258, 266 (1973).

however, in adhering to the proposition that it is the responsibility of a trial lawyer who takes on the defense of another to be aware of his client's basic legal rights and of the legitimate rules of the forum in which he practices his profession.[18] If he should unreasonably permit such rules to bar the assertion of the colorable constitutional claims of his client, then his conduct may well fall below the level of competence that can fairly be expected of him.[19] For almost 40 years it has been established that inadequacy of counsel undercuts the very competence and jurisdiction of the trial court and is always open to collateral review. *Johnson* v. *Zerbst,* 304 U. S. 458 (1938).[20] Obviously, as a practical matter, a trial counsel cannot procedurally waive his own inadequacy. If the scope of habeas jurisdiction previously governed by *Fay* v. *Noia* is to be redefined so as to enforce the errors and neglect of lawyers with unnecessary and unjust rigor, the time may come when conscientious and fairminded federal and state courts, in adhering to the teaching of *Johnson* v. *Zerbst,* will have to reconsider whether they can continue to indulge the comfortable fiction that all lawyers are skilled or even competent craftsmen in representing the fundamental rights of their clients.

---

[18] Indeed, at least this level of knowledge and proficiency would seem to be a prerequisite for the provision of "effective and substantial aid" as guaranteed by the Sixth Amendment. *Powell* v. *Alabama,* 287 U. S. 45, 53 (1932).

[19] "Counsel's failure to evaluate properly facts giving rise to a constitutional claim, or his failure properly to inform himself of facts that would have shown the existence of a constitutional claim, might in particular fact situations meet this standard of proof [of incompetent counsel]." *Tollett* v. *Henderson, supra,* at 266–267.

[20] *Zerbst* dealt specifically with an instance where trial counsel was altogether lacking, but "[i]t has long been recognized that the right to counsel is the right to the effective assistance of counsel." *McMann* v. *Richardson, supra,* at 771 n. 14 (citations omitted).