Johnny HENAGAN, Petitioner,

v.

Charles ANDERSON, Warden, State Prison of Southern Michigan, Respondent.

Civ. A. No. 79–72856.

United States District Court,
E. D. Michigan, S. D.

Oct. 24, 1980.

Arthur J. Tarnow, Detroit, Mich., for petitioner.

Frank J. Kelley, Atty. Gen., Lansing, Mich. by Sherwin Vine, Asst. Atty. Gen., Detroit, Mich., for respondent.

## OPINION AND ORDER GRANTING WRIT OF HABEAS CORPUS

GILMORE, District Judge.

Petitioner is presently incarcerated at the State Prison of Southern Michigan, where he is serving a life sentence resulting from his felony murder conviction in the Genesee County Circuit Court in 1967. He seeks federal habeas corpus relief, complaining of several errors.

Petitioner was tried jointly with one Harold Nunn and one Ernestine Campbell at the request of the prosecutor and over the objection of defense counsel.

At trial, the prosecution's theory was that Ernestine Campbell, Harold Nunn, and petitioner had agreed to have Ernestine Campbell lure James Oldacre out of the Ding Dong Cafe with the intent to rob him, but in the process he was killed.

Petitioner maintained his innocence, and relied on his good character. He admitted that he was at the scene of the crime and was hit by Mr. Oldacre, but claims he had returned to the car before Mr. Oldacre was killed by someone.

Petitioner took the stand to relate what happened. He testified that he was on the street, saw an argument between Nunn and Oldacre, attempted to stop the argument, was knocked to the ground by Oldacre, and left the scene with Oldacre still standing. On cross–examination, the prosecutor asked:

"... At no time did you ever tell the police this story, did you? ... the story about ... what you just testified to concerning the murder."

Further on in cross–examination, the prosecutor stated:

"This story that you are telling here today is the first time you have ever said anything about this matter. Isn't that correct?"

Harold Nunn, a co–defendant, testified and stated that petitioner intervened in the fight and blows were exchanged. He said petitioner was still in the fight after he had returned to the car, and that petitioner said he had left a knife in the man. On cross–examination Nunn said that he thought petitioner did the knifing because petitioner had told him that he did so. The prosecutor referred to a prior statement of Nunn which implicated petitioner, and the prior statement was received into evidence on motion of petitioner's attorney.

Ernestine Campbell, the other co–defendant, testified that petitioner was struggling with Oldacre and that she saw a flash in petitioner's hand. She heard petitioner say he left a knife in the man.

On closing argument, the prosecutor said that his theory was that death occurred in the course of a robbery and therefore was felony murder. The prosecutor claimed in argument that it was not necessary to prove malice, and emphasized the testimony of Nunn which incriminated petitioner.

Petitioner's counsel, in closing statement, argued that petitioner was not guilty. The closing argument of Nunn's attorney referred to the prior statement made by Nunn implicating petitioner.

On rebuttal, the prosecutor argued that he did not have to show malice to establish felony murder, and admitted that he could not show malice.

All defendants asked for a directed verdict of acquittal based on the prosecutor's

statement that he had not shown malice, and the prosecutor, in response, said he could show malice but he need not show it as an element of felony murder. The state trial court denied all three motions.

The instructions included a summary of the theory of Ernestine Campbell, which was that petitioner was fighting and had a knife, but there were no instructions given on petitioner's theory.

Petitioner was convicted on June 9, 1967, and was sentenced to life imprisonment. A timely motion for new trial was filed on July 17, 1967, and a subsequent motion for new trial was filed on December 27, 1976. The trial court entered orders denying both motions on April 5, 1977.

A claim of appeal was filed with the Michigan Court of Appeals on April 7, 1977. The Court of Appeals treated the claim as an application for delayed appeal and denied it on June 23, 1977. The Court of Appeals denied an application for rehearing on July 22, 1977. On January 23, 1978, the Supreme Court of Michigan remanded petitioner's case to the Court of Appeals upon petitioner's petition for leave to appeal, and ordered full consideration of the matter, as on a claim of appeal. See *People v. Henagan*, 402 Mich. 857 (1978).

The Court of Appeals issued an opinion on June 13, 1978, affirming Mr. Henagan's conviction, and on July 21, 1979, the Michigan Supreme Court denied leave to appeal. This habeas corpus proceeding followed.

Two threshold issues must be resolved. It is first contended by respondent State of Michigan that petitioner has not exhausted his state remedies, and that, therefore, this court is without jurisdiction. The case has had a long and tortuous history in the Michigan judiciary. It would serve little purpose to repeat all of the actions taken, but suffice it to say the case has been considered by the Michigan Court of Appeals, the Michigan Supreme Court, and that all of the issues that could be raised were considered in the State jurisdiction. The court does not understand the claim of the State that state remedies have not been exhausted. The Court holds specifically that all state remedies have been exhausted and that the claims made by petitioner can be considered by this Court.

A second threshold issue is whether this Court is barred from considering this petition by the laches doctrine contained in Rule 9(a) of the Rules Governing § 2254 Cases, 28 U.S.C. Foll. § 2254.

Rule 9(a) of the Rules Governing § 2254 Cases (supra) provides:

"A petition may be dismissed if it appears that the state of which the respondent is an officer has been prejudiced in its ability to respond to the petition by delay in its filing unless the petitioner shows it is based on grounds of which he could not have had knowledge by the exercise of reasonable diligence before the circumstances prejudicial to the state occurred."

A United States District Court may dismiss a petition under Rule 9(a) only if the State has somehow been prejudiced in its ability to respond to the petition. As to all but one of the issues raised in this habeas corpus proceeding, respondent has not even made an allegation as to how the state would be prejudiced in its ability to respond to the claims simply because of the passage of 13 years since the conviction. Since resolution of most of the issues depends primarily on a review of the trial court record, it does not appear that any such prejudice is present.

The respondent specifically alleges prejudice only as to the petitioner's claim of ineffective assistance of counsel. Respondent asserts that the state has been placed in an inequitable position with regard to this claim because petitioner's defense counsel may not even be available as a witness at this time; and because even if he is, expecting the state to rely on defense counsel's recollection, if any, concerning the trial which occurred more than 13 years ago is unfair.

It appears to the court, however, that, whether a defendant was afforded ineffective assistance of counsel can also be determined from the record and the transcript of

the proceedings. No testimony need be taken of defense counsel, nor need his recollection be relied upon. Furthermore, the Court of Appeals has made clear that it looks with disfavor upon the application of Rule 9(a) to completely preclude consideration of the merits of an issue raised in habeas corpus. *Davis v. Adult Parole Authority*, 610 F.2d 410 (CA6 1979).

## I

Petitioner first claims that the consolidation of his trial with his co–defendants' trials made his trial fundamentally unfair, in violation of his due process rights. He alleges that the unfairness resulted from the fact that both his co–defendants presented defenses which were antagonistic to him. The record shows that the consolidation of the trials was made upon the prosecutor's motion, and that petitioner's counsel initially objected to the consolidation. When given an opportunity by the trial court to prepare a more substantial foundation for this objection and to present it at a later time, petitioner's counsel failed to pursue the objection. It was pointed out by the Michigan Court of Appeals that at a May 8, 1967, hearing on People's Motion to Consolidate, defense counsel objected on the grounds he had not had sufficient time to prepare opposition to the motion. The trial court thereupon granted counsel a week to prepare his answer. None was forthcoming, and on May 23, 1967, the consolidated trial began without objection.

The Michigan Court of Appeals pointed out in its unpublished opinion that it was apparent from defense counsel's opening remarks to the jury that he anticipated adverse testimony from co–defendants, but apparently decided that the damaging testimony would appear weaker if it came from witnesses also on trial, and hence from witnesses having a motive to inculpate defendant in order to exculpate themselves. The Court of Appeals pointed out that defense counsel felt that his client's credibility would be greater than that of the co–defendants, and that the failure to press for separate trials was a matter of tactical

judgment by petitioner's attorney at the time.

■ Petitioner argues strenuously that the testimony of Mr. Nunn might never have been presented against him had there been separate trials because Mr. Nunn might have asserted a Fifth Amendment privilege and might not have been granted immunity to testify.

Whether Mr. Nunn would have testified against the petitioner if there was a separate trial, we will never know. One could speculate that he would, and one could speculate that he would not. So the fact that he was a co–defendant and elected to take the stand does not raise any question of prejudice sufficient to require the granting of a new trial.

The Michigan courts considered this issue and found that under Michigan law there was not sufficient prejudice in the consolidated trials to justify a reversal of the conviction.

The Sixth Circuit considered the issue of antagonistic defenses, and the requirement of separate trials in *Jenkins v. Bordenkircher*, 611 F.2d 162 (CA6, 1979). The Court said (pages 167, 168):

"We do not believe the mere existence of antagonistic defenses requires us to grant the writ in this case. . . . We conclude that while a claim of due process violation based on antagonistic defenses between jointly tried defendants is cognizable in habeas corpus, in order to prevail a petitioner must show both an abuse of discretion and prejudice from the denial of a severance motion. *Moore v. Cowan*, 560 F.2d 1298, 1301 (CA6, 1977) cert den., 435 U.S. 929, 98 S.Ct. 1500, 55 L.Ed.2d 525 (1978)"

In claiming a due process violation because of the failure to have separate trials, petitioner relies upon a claim that the antagonistic defenses were such that he was deprived of a fundamental right to a fair trial. It is true, as pointed out in *United States v. Crawford*, 581 F.2d 489, 491 (CA5, 1978) that antagonistic defenses can prejudice a co–defendant to such a degree that he is denied a fair trial.

There are two points to consider here. First is the question of whether a separate trial would have necessarily prevented the damaging testimony of petitioner's co–defendants from being given. It is argued strenuously by petitioner that had the co–defendants not been tried with him, their testimony would not have been available for use against the petitioner. This does not necessarily follow, and such a claim is mere speculation. The co–defendants might have voluntarily agreed to testify, they might have been given immunity, or other circumstances might have arisen on a separate trial that would have made their testimony available. So it is speculation to say they would not have testified had there been a separate trial.

A second point is whether or not the co–defendants would testify at any new trial of petitioner subsequent to the granting of any writ in this case. Since both co–defendants have already been convicted, it does not appear that they could claim a Fifth Amendment privilege even if they were now subpoenaed to testify at a new trial. Even if they did claim that privilege, and the privilege were sustained, they would be considered unavailable under Federal Rules of Evidence 804(a)(1), and their prior recorded testimony would be admissible under 804(b)(1).

It does not appear that there is a sufficient showing in this case of such prejudice by the failure to sever the trials to rise to the level of a due process violation.

However, even if it could be argued that there was a denial of due process because of the consolidated trial, and the Court holds specifically there was not, Wainwright v. Sykes, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) would bar petitioner's claim. In Wainwright, the Supreme Court held that failure to timely object to the admission of a confession under the applicable state procedural rule precluded federal review of the merits of petitioner's constitutional claim concerning the confession. Similarly here, the petitioner's attorney, as a tactical matter, failed to press his objection to the consolidation, and made a judgment call that the consolidated case should proceed. Clearly this was an intentional failure to timely object to the consolidation for tactical reasons. Therefore, under Sykes the matter is precluded from federal review.

## II

The second contention of petitioner is that he was denied his right to remain silent in violation of Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), and was therefore denied due process. The facts on which this allegation arise are as follows: Petitioner took the witness stand in his defense and during cross–examination by the prosecutor was asked whether or not he had told the police his version of the facts. The questioning was as follows:

"Q. Now, you have testified to a–to certain alleged facts here concerning this murder. At no time did you ever tell the police this story, did you?

A. Which story?

Q. The story about–what you just testified to concerning the murder?

A. No, I didn't."

Further on in the cross–examination the prosecutor asked the following questions:

"Q. How long were you there in Kansas City before you were arrested?

A. The twenty–third of December.

Q. So, about eight, nine days, would you say?

A. Yes, around eight or nine days.

Q. Then, you were brought back here. Isn't that correct?

A. That's correct.

Q. This story that you are telling here today under oath is the first time that you have ever said anything about this matter, isn't that correct?

A. That's correct."

Petitioner claims the prosecutor's questions brought before the jury the fact that petitioner did not make any statement upon his arrest or before trial to the police. It is contended that the cross–examination by the prosecutor denied petitioner due process

of law and a fair trial. Petitioner cites *Doyle*, supra, as authority, and contends in the present case there is no justification for the prosecution commenting on the silence of petitioner at the time of arrest and subsequent time. He further contends that the error was exacerbated by the fact that the prosecution asked the same question twice.

Respondent argues that the cross examination in question was not violative of petitioner's constitutional rights because it did not concern his silence "during interrogation or in an accusatory setting," and had nothing to do with what he had or had not told law enforcement officers; but rather dealt only with whether he had discussed the events in question with his wife or parents. This contention is not factually accurate, for the prosecutor specifically asked petitioner whether or not he had ever told the police this story, and whether or not the trial testimony was the first time he had ever said anything about this matter.

■ In *Doyle*, petitioners, after arrest, were given *Miranda* warnings[1], took the stand at trial and gave exculpatory stories that they had not previously told the police or the prosecutor. Over their counsel's objection, they were cross–examined as to why they had not given the arresting officer the exculpatory explanations. They were convicted, and the United States Supreme Court reversed their convictions, holding that the use, for impeachment purposes, of petitioners' silence at the time of arrest, and after they received *Miranda* warnings, violated the due process clause of the Fourteenth Amendment. The court held that post–arrest silence following such warnings is insolubly ambiguous, and it would be fundamentally unfair to allow an arrestee's silence to be used to impeach an explanation subsequently given at trial after he had been impliedly assured by the *Miranda* warnings that silence would carry no penalty.

*Doyle* was decided in 1976, some nine years after petitioner's conviction, and, therefore, it must be determined whether *Doyle* is retroactive.

Several cases in the Sixth Circuit have discussed *Doyle* and have assumed, without specifically ruling, that the case is retroactive. In *Hayton v. Egeler*, 555 F.2d 599 (CA6 1977), the court considered the effect of *Doyle* on a 1968 conviction in Livingston County, Michigan; in *Meeks v. Havener*, 545 F.2d 9 (CA6 1976), the court considered the effect of *Doyle* upon a conviction that was obtained long before the decision of *Doyle*; and in *Charles v. Anderson*, 610 F.2d 417 (CA6 1979),[2] the court considered the effect of *Doyle* upon a 1972 state conviction.

It therefore appears clear that in this circuit the effect of *Doyle* is retroactive, and the *Doyle* rule is applicable to this case.

The next question is the effect of *Doyle* on the facts of this case. In *Hayton v. Egeler* (supra), the court pointed out (page 602):

"Moreover, *Doyle* does not stand for the proposition that the exercise of the constitutional privilege to remain silent can never be used for discrediting a witness. *Doyle* did not overrule *Raffel v. United States*, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926), which allowed impeachment on the basis of a defendant's exercise of a constitutional right to remain silent. The Supreme Court in *United States v. Hale*, 422 U.S. 171, 175, 95 S.Ct. 2133, 2136, 45 L.Ed.2d 99 (1975), discuss the situation in *Raffel* in the process of distinguishing it.

"There a second trial was required when the first jury failed to reach a verdict. In reliance on his privilege against compulsory self–incrimination, the accused declined to testify at his first trial. At the second trial, however, he took the stand in an effort to refute the testimony of a government witness.

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

2. *Charles v. Anderson* was reversed by the Supreme Court of the United States in *Anderson*

*v. Charles*, —— U.S. ——, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980). The Supreme Court, however, did not reverse the determination that *Doyle* was retroactive.

Over objection, Raffel admitted that he had remained silent in the face of the same testimony at the earlier proceeding. Under these circumstances, the Court concluded that Raffel's silence at the first trial was inconsistent with his testimony at the second, and that his silence could be used to impeach the credibility of his later representations.' "

█ It is therefore clear that *Doyle* is applicable in this case, and that the cross–examination here was for no purpose other than to impeach petitioner's exculpatory trial testimony by implying that it was recently fabricated. It is therefore clear that the cross–examination was in violation of *Doyle*.

The court does not deem *Jenkins v. Anderson,* 65 L.Ed.2d 86 (1980), applicable in this case. *Jenkins* is applicable only for pre-arrest silence. *Doyle* is applicable to post-arrest silence. In this case it is clear that both instances of improper interrogation were related to post-arrest silence. A close reading of the two sets of questions requires that conclusion. In the first interrogation, the question was, "Did you ever tell the police this story?", and eventually the defendant answered, "No, I didn't." While the second series of questions began by referring to the time when the petitioner was in Kansas City, the final question included not only his time there, pre-arrest and post-arrest, but also his post-arrest time in Michigan. This would include, of course, his not making any statement to the police after arrest. Therefore it is clear that the rule in *Doyle* is applicable in this case.

█ The next question is whether the *Doyle* violation was harmless error under the standards of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), which held that before an error can be held harmless, the court must be able to declare that it was beyond a reasonable doubt.

In *Minor v. Black,* 527 F.2d 1 (CA6 1975) cert. den. 427 U.S. 904, 96 S.Ct. 3189, 49 L.Ed.2d 1198 (1976), the Sixth Circuit enunciated the standard for determining whether the prosecutor's error in using defendant's post–arrest silence to impeach his ex-

culpatory testimony at trial is harmless. The court said (page 5):

"We recognize that constitutional error in using pre–trial silence to impeach trial testimony may, on occasion, be harmless error ... However, to find harmlessness beyond a reasonable doubt we would have to conclude that, absent the cross–examination and closing argument, 'no juror could have entertained a reasonable doubt' as to petitioner's guilt ... "

In *Eberhardt v. Bordenkircher,* 605 F.2d 275 (CA6 1979), the court dealt with the issue of how the harmless error standard was to be applied in habeas corpus review of state convictions. In that case, the error involved was a comment by the prosecutor on the defendant's failure to take the stand.

In discussing the harmless error doctrine, the court stated (pages 278, 279):

" ... Harmless error, in the context of a violation of a constitutional right of a defendant, is an extremely narrow standard, permitting the State to avoid the retrial of a defendant only when it can demonstrate beyond a reasonable doubt that the error did not contribute in any way to the conviction of the defendant ...

"Depending upon the constitutional error involved, that heavy burden may be carried in a number of ways.... [Some cases] have focused on whether the case against the defendant was 'overwhelming and undisputed' ..., and whether the error could reasonably be viewed as eradicated by the rulings of the trial judge, his admonitions to counsel, and instructions to disregard.... Since harmless error analysis essentially involves a question of whether the error is but a 'small error or defect that has little, if any, likelihood of having affected the result of the trial,' ..., whether the trial was otherwise relatively error–free is important. As Judge McCree noted for the court in *Smith* (supra) 'prejudice may be magnified by the cumulative effect of repeated, improper conduct' ...

"Since reasonable people may differ on the strength of a case, or the efficacy of

jury instructions, there will in most cases be some disagreement on the issue of harmless error. But the guidelines mentioned above are of some help, as is the fact that harm is presumed to have flowed from constitutional error; the burden is on the state to demonstrate conclusively to the contrary. It is not enough for the reviewing court to feel that the evidence is strong and that the defendant probably would have been convicted anyway. That is a decision for the jury to make, unaffected by improper argument or impermissible inferences urged by the prosecutor."

The burden on the state is thus an exceedingly heavy one. It must demonstrate conclusively that no harm flowed from constitutional error, and the mere fact that the reviewing court feels the evidence is strong is not sufficient in and of itself to overcome the presumption of harm from constitutional error.

Although other cases in the Sixth Circuit[3] have found harmless error beyond a reasonable doubt upon an examination of the entire transcript establishing a strong case of accused's guilt and finding strong evidence in favor of accused's guilt, these cases were decided before *Eberhardt* (supra) and *Charles v. Anderson* (supra). In *Charles v. Anderson*, the court reiterated the rule that harmless error is an extremely narrow standard permitting the state to avoid a retrial of a defendant only when it can demonstrate beyond a reasonable doubt that the error did not contribute in any way to the conviction of the defendant.

▮ In this case the prosecutor twice asked petitioner on cross-examination about his prior silence. One inquiry related to his failure to tell the police this story; the other inquiry related to his failure to tell it to his wife or his parents. Under the rule of *Doyle*, this questioning was improper. The error was exacerbated by the fact that the prosecution twice inquired into the silence.

It is true that there was strong evidence of petitioner's guilt, but there were several versions of the facts given by various witnesses, and it is clear that the credibility of the witnesses was a major factor in the determination of the case by the jury. The effect of the prosecutor's cross-examination is obvious. The cross-examination clearly attacked the credibility of petitioner, and left the impression with the jury that petitioner had fabricated his testimony on the stand.

It is argued by the State of Michigan that there was strong evidence of guilt, and that the prosecutor's cross-examination was relatively brief, and it could not have had a serious effect upon the outcome of the case. He contends that the *Doyle* error was relatively insignificant, and harmless beyond a reasonable doubt because the evidence of petitioner's guilt was overwhelming.

It is also argued that the two co-defendants' testimony strongly tended to show petitioner's guilt.

Respondent claims that it does not seem possible that the mere elimination of the objectionable cross-examination concerning petitioner's silence prior to trial would have been enough to raise a reasonable doubt in the minds of the jurors. It is therefore argued that the *Doyle* violation was harmless error and should not serve as a basis for overturning the conviction.

This argument, however, ignores the high standard set by *Eberhardt* (supra) and *Chapman* (supra). As *Eberhardt* pointed out, harmless error is an extremely narrow standard when constitutional rights are involved, and the state can avoid a retrial only when it can demonstrate beyond a reasonable doubt that the error did not contribute in any way to defendant's conviction.

It only takes a single question, to remind the jury that defendant is telling this story for the first time. This type of cross-examination can easily fix in the jury's minds the constitutionally impermissible conclusion that defendant had some duty to speak

**3.** *Meeks v. Havenger*, 545 F.2d 9 (CA6 1976); *Hayton v. Egeler*, 555 F.2d 599 (CA6 1977).

prior to trial, and that because he did not he is lying at trial. This is especially true where it is repeated as it was here. Here the state's case, of course, was disputed. The defendant took the stand and denied participation in the crime, and although there was certainly sufficient evidence of guilt to sustain the jury's verdict of guilty, one could not conclude that it was so overwhelming that the court could say beyond a reasonable doubt that the error in the cross-examination was harmless. Therefore petitioner's writ of habeas corpus must be granted.

Other claims of error were made concerning the trial court's instructions and ineffective assistance of counsel. In view of the court's conclusion here, however, it need not address these claims.

For the reasons given, a writ of habeas corpus will be granted and the defendant released, unless the state commences retrial of this matter within 90 days of the date of this opinion. If the state commences retrial within 90 days of the date of this opinion, the writ will not issue.