Angelo CALDAROLA, Petitioner,

v.

William C. QUICK, Superintendent of Wallkill Correctional Facility, and Robert Abrams, Attorney General of the State of New York, Respondents.

No. 81 CV 33 (ERN).

United States District Court, E.D. New York.

July 26, 1983.

---

Martin Geduldig, Floral Park, N.Y., for petitioner.

Robert Abrams, Atty. Gen., State of N.Y., by Eugene Murphy, Asst. Atty. Gen., New York City, for respondents.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

In 1976, petitioner Angelo Caldarola pled guilty to an indictment charging burglary in the second degree. Asserting that his plea resulted from incorrect statements made by his attorney, the prosecutor, and the trial judge, concerning potential sentencing consequences, petitioner seeks a writ of habeas corpus setting aside the burglary conviction. 28 U.S.C. § 2254. After conducting an evidentiary hearing and completely reviewing the record, however, the court finds petitioner's claims insufficient to invalidate his guilty plea. For the reasons that follow, the writ is denied.

*Sentencing Possibilities*

Central to petitioner's challenge is his contention that he pled guilty in exchange for an assurance that he would not be sentenced as a persistent felony offender under N.Y. Penal Law § 70.10. As applied when petitioner was under indictment, § 70.10(2) dictated that a defendant found to be a persistent felony offender would receive an indeterminate sentence; the statute set a minimum of between fifteen and twenty-five years of incarceration and a maximum term of life imprisonment. To be found a persistent felony offender, a defendant must have had two or more prior felony convictions which met the following criteria:

> (1) that a sentence to a term of imprisonment in excess of one year, or a sentence to death, was imposed therefor; and
>
> (ii) that the defendant was imprisoned under sentence for such conviction prior to the commission of the present felony; and
>
> (iii) that the defendant was not pardoned on the ground of innocence.

*Id.,* § 70.10(1)(b). Additionally, the statute required the sentencing judge to make a post-conviction determination "that the history and character of the defendant and the nature of and circumstances of his criminal conduct indicate that extended incarceration and life-time supervision will best serve the public interest." *Id.,* § 70.10(2). Although petitioner had a record of prior felony arrests and convictions, he was not vulnerable to sentencing as a persistent felony offender because his prior convictions did not meet the requisite incarceration element.

Petitioner did have at least one prior conviction which had resulted in a sentence for incarceration in excess of one year, and thus he qualified for sentencing as a predicate felony offender pursuant to the then-effective N.Y. Penal Law § 70.06. Section 70.06(2) required a sentencing judge to fix an indeterminate sentence within statutory guidelines. Petitioner was indicted on and pled guilty to a Class C felony and lesser included charges. Accordingly, he faced a maximum sentence exposure of between six and fifteen years imprisonment; the minimum was set by statute at half the maximum actually imposed. *Id.,* § 70.06(2), (3)(b), & (4). Petitioner was in fact sentenced to six-to-twelve years imprisonment.

438

## The Guilty Plea

As petitioner twice admitted, he was arrested on February 9, 1975, at about 7 p.m., in the home of Dr. and Mrs. Eng on Staten Island. Some money and jewelry belonging to the homeowners were recovered from his pocket. Petitioner was released on bail initially set at $5,000.

On March 26, 1975, petitioner was arraigned in New York State Supreme Court in Richmond County before the Honorable Theodore G. Barlow. Although petitioner had retained Martin Light, Esq., as legal counsel, he was represented at the arraignment by Louis Diamond, Esq. The prosecutor requested that bail be increased to $10,-000. Judge Barlow then inquired as to whether petitioner had two prior felony convictions, and Diamond responded that he did. Over Diamond's protests, Judge Barlow set bail at $50,000, erroneously stating, "The man is facing a life imprisonment." Approximately three weeks later, bail was reduced to $25,000, and petitioner obtained his release.

The next proceedings took the form of plea negotiations in December 1975. In the interim, petitioner and attorney Light assertedly did not discuss the potential for a sentence of life imprisonment. Light's deposition testimony, adopted as an exhibit by both petitioner and respondent, declared that Diamond never mentioned Judge Barlow's statement about the possibility of a life sentence. As to conversation with petitioner, Light stated, "Never once did we have a discussion about persistent felony offender or life imprisonment. The only conversations were, I don't see how you could go to trial.... I told him it's the type of case you have to take a plea." Petitioner's Exhibit ("PX") 1 at 9-10.

Focusing on sentencing possibilities, Light had known that petitioner had multiple prior burglary arrests. He remembered informing petitioner of his vulnerability to sentencing as a predicate felony offender, but was unable to recall any concern about the persistent felony offender provision. He added, "[I]t's unheard of. I don't think I have ever had a case as—I don't think I

know of a case of anyone ever being sentenced as a persistent felony offender. So, that conversation never came up between attorney and client, unless you run into the situation like that in February of 1976, where the judge threatened him." PX 1 at 8-9. Petitioner's testimony confirmed that the persistent felony offender issue was not considered during this period.

Court appearance was scheduled in December 1975. While petitioner waited, Light, the prosecutor Stanley S. Nirenberg, and Judge Barlow participated in plea negotiations. No one disputed that petitioner was then offered an opportunity to plead guilty to burglary in the third degree, a Class D felony. Memories were vague, however, as to whether the offered sentence would be two-to-four or three-to-six years of imprisonment. Again without dispute, the minimum proposed time was necessarily half the maximum because petitioner was to be treated as a predicate felony offender. N.Y. Penal Law, § 70.06(4).

Light relayed the offer to petitioner. At the evidentiary hearing, petitioner testified that he was pleased with the offer, but that he did not want to be incarcerated during the upcoming Christmas holidays. He thus sought an adjournment which he claimed Light requested and obtained. The risk of life imprisonment was not discussed.

At his February 28, 1983 deposition, Light testified that the offer was to plead guilty to a Class C or D felony and to be sentenced to two-to-four or three-to-six years of imprisonment. He acknowledged that petitioner's status as a predicate felony offender was significant to the sentence offer, but he denied any discussion of persistent felony offender sentencing in the December negotiations. Significantly, Light's testimony did not parallel petitioner's assertions that the plea decision was adjourned. Instead, Light claimed that petitioner simply rejected the offer in an apparent effort to manipulate an extension of his freedom during the holidays. Light added that petitioner "just didn't realize he was playing with fire." PX 1 at 21. Light

did state, however, that the rejected offer was not withdrawn.

At his deposition, counsel for·respondent called Light's attention to an affidavit executed by Light on August 8, 1980. In the affidavit, Light stated that he knew that petitioner had at least two prior felony convictions, and that he relied on the judge's and the prosecutor's statements concerning persistent felony offender status. He continued, "[B]ecause of the apparent potential for such a severe sentence, I endeavored to negotiate a disposition of the case, through a plea of guilty, that would guarantee that [petitioner] would not be sentenced as a persistent-felony offender." Respondent's Exhibit ("RX") B at 1. Apparently describing the December 1975 negotiations, Light stated that the offer would have allowed petitioner to plead guilty to a Class D felony "with the stipulation that the persistent-felony offender provisions would not be invoked," and that "after [petitioner] rejected that offer, the offer was withdrawn." *Id.* at 2. Light explained the inconsistency between his affidavit and deposition accounts: "In 1980 I may have had some other notes or the file in front of me, which I don't have now because I don't have any independent recollection . . . ." PX 1 at 15.

Testifying at the evidentiary hearing, prosecutor Nirenberg also described the December 1975 negotiations. He confirmed that an offer was made to sentence petitioner to either two-to-four or three-to-six years as a predicate felony offender if petitioner would plead guilty to burglary in the third degree, a Class D felony. According to Nirenberg, when Light returned from conferring with his client, Light stated that petitioner refused to plead. The rejected offer was withdrawn, and Nirenberg prepared for trial.

Petitioner next appeared before Judge Barlow on Friday, February 20, 1976. The proceedings commenced with Light's representations that petitioner had gotten out of a sickbed to attend the scheduled court date because he understood that he would be allowed to plead to a Class D felony. Judge Barlow responded that the offer Light de-

scribed had been rejected by petitioner and subsequently withdrawn. Petitioner's options, the judge stated, were to plead to the first count in the indictment with no promise as to sentencing except that persistent felony offender treatment would not be invoked. Citing petitioner's apparent illness and fever, Light said that petitioner was unprepared to plead and he rejected the offer. The exchange between Light and Judge Barlow continued:

The Court: . . . Is [petitioner] aware of the possible penalties of multiple felony offender?

Mr. Light: I told him that you stated if he goes to trial and loses, you would give him life imprisonment.

The Court: I did not state that.

Mr. Light: Oh, I thought that was my understanding.

The Court: No, Mr. Light, you know better than that. But the top penalty of a multiple offender who gets convicted of any felony, that is, a third felony offender, he gets 25 years to life. Did you explain that to your client?

Mr. Light: No, I told him he got life. But it is 25 to life?

The Court: That you serve 25 before you are eligible for parole. I think we will pick a jury this afternoon. . . .

Petitioner's Brief, Appendix B, at 3. In deference to Light's contentions concerning petitioner's health, however, the judge finally agreed to postpone the trial to the following Monday.

Light's deposition testimony elaborated on this court conference. He stated that he had called Nirenberg a few days earlier to say that petitioner wanted to accept the December plea offer. According to Light, Nirenberg offered no disagreement. On February 20, Light and Nirenberg met in Judge Barlow's chambers and, Light stated, "I said, we'll take the D; and the judge says, there ain't no D." PX 1 at 11. At this point, Nirenberg purportedly acknowledged his conversation with Light but denied agreeing to the plea arrangement.

Judge Barlow allegedly repeated that the offered plea had been rejected and with-

drawn, and that the case would go to trial. Light claimed that Judge Barlow suggested that the prosecutor seek persistent felony offender treatment. Distressed, Light asked that the conference be moved to the courtroom so that a record could be made. Reviewing the February 20 transcript, Light explained the exchange between the judge and himself, stating that the judge "tried to protect the record" while Light tried to convey the conversation that occurred in chambers. PX 1 at 19.

The proceedings continued on February 23, 1976. Petitioner and Light agreed that they did not confer during the intervening weekend. When the case was initially called, petitioner was not present. Judge Barlow promptly ordered the bail forfeited and issued a bench warrant. Approximately twenty minutes later, petitioner arrived. Despite petitioner's apologies, Judge Barlow denied motions to vacate the warrant and to reinstate bail.

Light reiterated that petitioner was ready to accept the offer to plead to a Class D felony. Again the judge stated that the rejected offer had not been renewed. Light moved that Judge Barlow should recuse himself, stating:

> It was apparent last week when the defendant was standing before the Court with a 103 fever, at which time defendant offered to take the offer of the D felony, and the Court stated that that was off, that you plead to the indictment right at the moment, or otherwise go to trial and get convicted, you are facing 25 years to life as a multiple felony offender. And defendant feels that he cannot get a fair trial due to your Honor's attitude towards him, with the entire negotiations in this case, and defendant feels that your Honor is dictating the offer of the plea as it appears last week, and, true, today the district attorney makes a statement, but last week there were no statements made by the district attorney, and during the conference the district attorney, my recollection is, that it was your Honor that said no, you plead to the indictment or you face 25 years to life.

Petitioner's Brief, Appendix C, at 5–6. Nirenberg responded, stating:

> Your Honor, I would like to point out that the People must also be a party to plea bargaining process, and I remember in chambers I kept on telling Mr. Light, it is not up to the Judge, the People must also accept the plea to a D felony. And we made it clear to Mr. Light ever since December 12th that the People, once he refused that offer of a D, the People were not willing to renew it.

*Id.* at 6. Light persisted, citing his purported telephone conversation with Nirenberg and his understanding that petitioner would be allowed to plead to a Class D felony. Light also argued against the invocation of the persistent felony offender provision. Specifically, he reasoned that petitioner had no record of violence despite multiple arrests and convictions on burglary charges.

In reply, the judge stated that he had personally informed Light on the previous Thursday that the offer to plead to a Class D felony was no longer available. The judge added:

> Now, there is nothing in the multiple offender statute which speaks of crimes of violence. Also, *your client has never been threatened with anything.* In the conversation regarding plea bargaining, it was pointed out to you that *if your client in fact has two prior felony convictions, he is exposed to treatment as a multiple felony offender.* That is all that has happened. Now we are ready for trial.

*Id.* at 10 (emphasis added).

Judge Barlow began to discuss voir dire. Light interrupted, and asked to approach the bench. Told to speak on the record, Light conferred with Nirenberg, and Nirenberg informed the judge that petitioner offered to plead to a Class C felony if he could be promised a sentence of five-to-ten years. The judge and the prosecutor both refused the deal.

Light then inquired about the warrant and bail forfeiture, and Judge Barlow ordered that petitioner be remanded and

searched. After the defendant reentered the courtroom, the jury was brought in.

As the first venireman was to be questioned, Light again asked to approach the bench. A two-minute side bar discussion ensued, followed by a conference between Light and petitioner. Finally, Light indicated that his client would plead guilty.

The plea colloquy began as follows:

BY THE COURT:

Q. Angelo Caldaroca [sic].

(Defendant stands at counsel table.)

Q. You have heard your attorney move to withdraw your plea of not guilty previously entered to indictment number 130/1975, and to substitute a plea of guilty to each and every count of the indictment. Is that what you want to do?

A. Yes, your Honor.

Q. Now, has anyone made any threats to you to persuade you to plead guilty?

A. No, your Honor.

Q. Has anyone made any promises to you, other than that I will release you on bail to allow you to wind up your affairs pending sentence?

A. No, your Honor.

Q. Aside from that promise, has anyone made any promise of any kind to persuade you to plead guilty?

A. No, your Honor.

*Id.* at 19–20. Petitioner went on to waive his constitutional rights and to admit the elements of the crime.

Again, subsequent testimony reflected different versions of the February 23 events. Light's deposition provided the following analysis of Nirenberg's recorded statements that the offer to plead to a Class D felony had been withdrawn in December:

That is a lie. He knows it.... The part that the D felony was offered is correct, and that we refused it was correct. And, left out the part that I said, Stanley, he's not prepared to take it now because of the holidays, and we'll see if we take it after the holidays. And, he never said to me, if you don't take it, then you'll never get it....

PX 1 at 18. Light also testified that during the side bar conference, Nirenberg and Judge Barlow refused to agree to a specific sentence, but did promise that petitioner would not be treated as a persistent felony offender. Both Light and the petitioner claimed that petitioner was informed of this promise.

In contrast, Nirenberg testified that no promise concerning persistent felony offender status had been made. The only agreement reached in the side bar conference, Nirenberg claimed, was that petitioner would be released on bail pending sentencing. When Nirenberg's attention was called to Light's description of the telephone conversation between Light and himself, Nirenberg denied that the call occurred. Addressing Light's recorded statements about Nirenberg's threat to seek persistent felony offender status if petitioner went to trial, Nirenberg testified, "[Light] wasn't telling the truth.... I never threatened him with persistent felony offender." Evidentiary Hearing Transcript at 128.

Petitioner contended in his testimony and briefs that he pled guilty solely to avoid the risk of life imprisonment. His briefs specifically claimed, "my acknowledgment ... in the plea minutes that no promises had been made to me in exchange for the plea, related only to the maximum sentence of 15 years which could be imposed under the Class C felony to which I was pleading. It did not mean ... that the court was still free to impose a life sentence on me following my guilty plea." Petitioner's Brief at 11.

Sentencing was scheduled for March 31, 1976, and petitioner was released on bail. The presentence report, dated March 26, 1976, was submitted as an exhibit at the evidentiary habeas hearing. Listing a significant number of prior arrests, the report noted that although petitioner was aware that he was a second felony offender and knew he would be incarcerated, he nonetheless "made it obvious that he considered the court process a big joke." Petitioner was further described as an intelligent but

"shrewd, manipulative, amoral individual who expressed no remorse for his actions" and who "consider[ed] himself a professional burglar." RX A at 4.

On the scheduled sentencing date, petitioner sought an adjournment to conclude various personal affairs prior to incarceration. He did, however, formally admit to a prior felony conviction, thus establishing the basis for sentencing as a predicate felony offender. On April 28, 1976, petitioner was sentenced to six-to-twelve years of incarceration.

*Post-Sentence Proceedings*

Petitioner retained new, undisputedly competent counsel and proceeded with an appeal. His appeal papers raised two issues: that he was not properly informed of his rights and of the consequences of his statements when he admitted the prior felony on March 31, 1976, and that his plea colloquy failed to elicit the essential element that the burglary occurred at night. His conviction was affirmed by the Appellate Division, *People v. Caldarola,* 59 A.D.2d 722, 398 N.Y.S.2d 347 (2d Dep't 1977), and leave to appeal was denied.

His appeal completed, petitioner commenced *pro se* research into a possible federal habeas petition. According to his brief, petitioner discovered through this research that he could never have been subjected to persistent felony offender treatment. Petitioner filed a motion to vacate the conviction pursuant to N.Y.Crim. Proc.Law § 440.10(1)(b). He asserted, first, that his guilty plea was made involuntarily and unintelligently because he was functioning under the misapprehension that he could have been sentenced to a term of twenty-five years to life imprisonment, and, second, that his attorney's failure to clarify this issue deprived him of his sixth amendment right to the effective assistance of counsel. Finding that petitioner had not explained his failure to raise these issues on direct appeal, the State court denied the relief as barred by N.Y.Crim.Proc. Law § 440.10(2)(c), and leave to appeal to the Appellate Division was denied.

Petitioner turned to the federal courts, filing his first petition for a writ of habeas corpus. The United States District Court for the Northern District of New York summarily dismissed the writ. Noting that a factual basis existed for the plea, the court concluded:

[T]his guilty plea is constitutionally sound even though there might have existed misunderstanding or mistake as to possible sentence that did not affect the understanding of the charge or voluntariness of the plea of guilty finally made. In a lateral attack such as this on a plea of guilty, prejudice must be shown affecting the voluntariness of the plea.... [T]here is failure here to submit affidavit of attorney that he was unaware and uninformed that Petitioner was not subject to multiple offender treatment and if he were so informed, he would have acted differently and not offered the plea but would have continued the trial to the jury verdict.

*Caldarola v. Henderson,* 79 CV 124, slip op. at 3–4 (N.D.N.Y. June 1, 1979). The court also rejected the sixth amendment claim.

The Second Circuit Court of Appeals affirmed the dismissal. The court observed that the offer to plead guilty to a Class C felony in exchange for the promise that the persistent felony offender provision would not be invoked was withdrawn three days before the petitioner pled, and that petitioner expressly stated that his plea did not result from any promise or threat. The court held that the petition "was properly denied because [petitioner] failed to allege facts that would have supported any logical inference that he relied on misinformation, or that he was prejudiced thereby." *Caldarola v. Henderson,* 633 F.2d 202 (2d Cir. 1980).

Petitioner obtained the affidavit from Light which has been discussed throughout this order, and he returned to State court. He raised the same claims he had asserted in his first collateral State proceeding and in his habeas writ. In this third denial of an attack on the conviction, the State court found the record "devoid of factual support

for misrepresentation," and thus held that petitioner had not met the substantive requirements of § 440.10(1)(b). RX G at 3. Specifically noting that "[t]he present issue was acknowledged by defendant's counsel during a bail application pending appeal," this second State court also held that petitioner was barred from a collateral attack on his conviction by his failure to raise these contentions on direct appeal. *Id.* at 4. Leave to appeal was again denied.

Petitioner's second attempt to seek a writ of habeas corpus was directed to this court. Tracing the procedural history of the entire action, this court believed itself bound by the State court's citation to procedural default in its refusal to consider a collateral attack on the conviction. *Forman v. Smith,* 633 F.2d 634 (2d Cir.1980); *see Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Accordingly, the writ was dismissed by unpublished order. 81 CV 33 (Oct. 7, 1981).

This court also denied petitioner's motion for a certificate of probable cause and for leave to proceed on appeal *in forma pauperis.* Simultaneous with a grant of a certificate of probable cause and *in forma pauperis* status, the Second Circuit ordered the case "remanded to the District Court for an evidentiary hearing on the factual issues raised." *Caldarola v. Quick,* 81 CV 2355 (2d Cir. July 16, 1982).

## DISCUSSION

*Procedural Bar*

■ Primarily, the court would adhere to its prior holding. The State courts' determinations that petitioner cannot raise a collateral attack on this conviction should bar this habeas review. *Forman v. Smith,* 633 F.2d 634 (2d Cir.1980). Petitioner has shown no cause for his failure to raise the misinformation issue on direct appeal. Petitioner asserts that he never apprised his appeal counsel that the plea was made in exchange for a misinformed, unrecorded promise. Incredulously, petitioner essentially contends that he sought to set aside a guilty plea and yet failed to describe to his appeal counsel the very promise upon which

he asserts the plea was made. Moreover, the misinformation was replete in the State transcripts. Petitioner's appeal counsel seemingly determined that the adequacy of sentencing knowledge was not so significant as to merit citation on appeal. That determination should bar both a State collateral attack and a subsequent federal habeas review. *See Ennis v. LeFevre,* 560 F.2d 1072 (2d Cir.1977); *United States ex rel. Hoover v. New York,* 469 F.Supp. 481 (S.D.N.Y.), *aff'd,* 607 F.2d 1040 (2d Cir. 1979). In view of the remand, however, the court now addresses the merits of petitioner's claims.

*The Merits*

■ To set aside a guilty plea, petitioner must first demonstrate that he was unaware of the actual sentencing possibilities. Additionally, he must show that he would not have chosen to plead guilty had he possessed accurate information. *Hunter v. Fogg,* 616 F.2d 55, 58 (2d Cir.1980); *Caputo v. Henderson,* 541 F.2d 979, 984 (2d Cir. 1976).

The misstatement that petitioner was in jeopardy of life imprisonment appeared repeatedly in the State transcripts. In most instances, however, petitioner was remarkably unimpressed with its implications. The judge first mentioned life imprisonment at petitioner's arraignment, yet petitioner never discussed the matter with his counsel in the nine months between his arraignment and the first plea discussions. Despite Light's 1980 affidavit, the record is overwhelming that the persistent felony offender issue bore little or no influence on the December 1975 events. Nothing said about a lengthy recidivist sentence had any discernible impact on either petitioner or his attorney before February 20, 1976.

Admittedly, the February 20 transcript revealed a preoccupation with the persistent felony offender issue. Petitioner's efforts to recast that discussion as threatening, however, cannot be supported by the record. Only petitioner's attorney claimed a threat of life imprisonment had been

made, and Judge Barlow specifically corrected that assertion. Judge Barlow's statements, although an erroneous statement of the law, merely raised the possibility that petitioner would eventually suffer persistent felony offender treatment. The judge did not threaten, and the prosecutor was notably silent.

On February 23, Judge Barlow further clarified that post-conviction, recidivist sentencing was a potential, but not certain, consequence facing petitioner. The prosecutor again raised no argument. Again, only petitioner's counsel spoke of an inevitable risk.

█ In light of the equivocations by Judge Barlow and the absence of recorded statements by the prosecutor, petitioner cannot sustain his attempted portrayal of an egregious barrage of misstatements and threats. However, the judge, the prosecutor, and the defense counsel were indisputably functioning from a basic misunderstanding about petitioner's sentence exposure, and the incorrect information was clearly conveyed to the petitioner. Thus petitioner has proven that he was unaware of, and in fact affirmatively misinformed about, the actual sentencing alternatives. See, e.g., Williams v. Smith, 591 F.2d 169, 172 (2d Cir.1979), cert. denied, 442 U.S. 920, 99 S.Ct. 2845, 61 L.Ed.2d 289 (1979).

For two reasons, however, petitioner has not shown that he would have decided to pursue his case to jury verdict had he known the correct sentencing possibilities. First, petitioner had ample motivation to plead guilty regardless of what promises were made or what he believed his sentence exposure to be. Thus the court concludes that petitioner would have chosen to plead guilty even if he had been told the correct sentencing possibilities. Second, the pivotal allegation—that, at the time petitioner pled, he was promised that the persistent felony offender statute would not be invoked—is incredible.

Petitioner's statements demonstrated, and Light acknowledged, that petitioner most likely would have been convicted. See, e.g., Williams, 591 F.2d at 172–73; Kel-leher v. Henderson, 531 F.2d 78, 82 (2d Cir.1976). He was arrested in a stranger's home with the homeowner's money and jewelry in his pocket. He has twice conceded the elements of burglary. His attorney advised him not to proceed to trial, and all their efforts were directed at plea bargaining.

Petitioner's behavior throughout the State proceedings manifested a consistent desire to postpone the day of imprisonment. To remain free longer, he refused the December plea offer, and he continued to seek sentencing delays even after he pled. Notably, on his arrival in court on February 23, 1976, petitioner's bail was revoked and he was remanded into custody. When he pled, he was given the express, recorded promise that he would be freed on bail pending sentencing. Facing likely conviction and certain incarceration, petitioner's desire for present freedom could easily have prompted his decision to plead. In so doing, petitioner also gained possible leniency by appearing reasonable before the sentencing judge.

These motives are supported by the record, and the assertion that the plea was impelled by the unrecorded promise is not. Petitioner's conduct throughout the State proceedings is inconsistent with his present assertion that he was overwhelmed by a fear of life imprisonment. Judge Barlow first cited the lengthy sentence possibility at petitioner's arraignment as ground to increase his bail requirement tenfold. Despite a resultant three-week incarceration, petitioner never discussed the issue with his counsel. When offered a significantly shorter sentence in December 1975, petitioner's apprehension did not inspire him to accept. Even in February 1976, when the potential for persistent felony offender sentencing was most seriously pressed, the allegedly fear-stricken petitioner did not seek any explanation from his counsel during the weekend between court appearances.

Most significant, petitioner expressly denied the existence of this promise during the plea colloquy. While second-guessing a petitioner's motives is perhaps the most dif-

ficult task of a court confronted with a collateral attack on a guilty plea, *see United States v. Tateo,* 214 F.Supp. 560, 565 (S.D.N.Y.1963), petitioner's silence belies his present contention that the promise was his overriding concern. *See, e.g., Johnson v. Fogg,* 653 F.2d 750, 752–53 (2d Cir.1981), *cert. denied,* 456 U.S. 907, 102 S.Ct. 1755, 72 L.Ed.2d 164 (1982). Although the gravamen of petitioner's claim is that his plea was induced by his paramount concern that he not be sentenced to life imprisonment, he argues that he was thinking only of the absence of a promise of specific limitations on sentence length when he told the judge no promises had been made. He had just concluded consultation with his counsel, and the plea colloquy commenced with inquiry into whether any threats or promises induced the plea. If the alleged promise was petitioner's foremost reason to plead, his colloquy responses are inexplicable. Petitioner was no stranger to the courts, *see, e.g., Caputo,* 541 F.2d at 984; *cf. Cooks v. United States,* 461 F.2d 530 (5th Cir.1972), and his solemn statements made in open court will not be so lightly set aside. *See Blackledge v. Allison,* 431 U.S. 63, 74, 97 S.Ct. 1621, 1629, 52 L.Ed.2d 136 (1977); *Johnson,* 653 F.2d at 752.

Petitioner's subsequent silence is also revealing. Apparently he never mentioned the all-important promise during presentence interviews, at sentencing, or to his subsequent appeal counsel. The latter is especially telling: This promise, if true, should by all reason have been an inevitable factor in the preparations made by the attorneys retained to challenge the validity of the guilty plea. *See, e.g., Williams,* 591 F.2d at 173; *Black v. Coombe,* 506 F.Supp. 626, 630 (S.D.N.Y.), *aff'd mem.,* 672 F.2d 899 (2d Cir.1981).

Admittedly, Light also testified that the promise was made. Light's deposition testimony, however, was by his own admission a post hoc effort to reconstruct events as to which he had no present recollection. Throughout the State proceedings, Light showed no hesitancy at interpreting statements and circumstances broadly to benefit his client. Evidently, his present recitation of the relevant events suffers from this same tendency. The inconsistencies and even contradictions in Light's many statements, past and present, render incredible his assertion that a promise not to seek persistent felony offender status was made. *See, e.g., Williams,* 591 F.2d at 173 n. 7.

For example, in deposition Light stated that he never considered the persistent felony offender issue until February 1976, and further contended that the December plea offer was never withdrawn. In his 1980 affidavit, however, Light noted a stipulation in the December offer concerning persistent felony offender status, but added that the offer was withdrawn. The February 1976 transcripts were devoid of reference to that stipulation, but did contain Light's repeated assertions that the December offer was not withdrawn. Finally, Light's repeated statement that the December plea was rejected by his former client directly contradicted petitioner's claim that the matter was simply adjourned.

Light's recollections are also inconsistent with other participants' descriptions, both when the events occurred and presently. For example, in the February 20 transcript, Light stated that Judge Barlow raised the persistent felony offender issue as a threat, which Judge Barlow promptly denied. On February 23, however, Light said that the prosecutor made the threat. Judge Barlow again explained his position, declaring that no threat was made and phrasing the persistent felony sentencing risk in hypothetical terms. Silent on the record, the prosecutor has since refuted Light's assertion. Addressing the December plea offer, Light testified that the offer was never withdrawn, while the prosecutor stated that it was expressly withdrawn. However, Light's deposition testimony was in conflict not only with the prosecutor's present assertions, but also with Light's 1980 affidavit, and with Judge Barlow's and the prosecutor's recorded February 1976 statements.

Most central to the ultimate issue of whether petitioner relied on the misinformation, Light and the prosecutor further

disagreed in their testimony concerning the crucial side bar discussion, differing on whether petitioner was promised not to be treated as a persistent felony offender just prior to entering his plea. In view of the many inconsistencies in Light's testimony, the prosecutor's representation is simply more believable. Moreover, no reason exists to discredit the prosecutor, whose present account corresponds with statements made by himself and Judge Barlow in the February 1976 proceedings.

Finally, Judge Barlow's recorded statements must be considered. Throughout the proceedings, the judge never hesitated to recount express terms of any proposed plea bargain, yet during the plea colloquy he makes no mention of the promise not to invoke persistent felony offender treatment. In fact, the otherwise outspoken Light's conspicuous silence at the vital colloquy is also inexplicable.

As noted, petitioner, as well as his counsel, always believed he was facing likely conviction. Apparently, he pled because he desired immediate freedom and sought judicial leniency. He had initiated an unaccepted offer to plead to five-to-ten years of imprisonment, and he ultimately received a six-to-twelve year sentence. Since he always risked a minimum of seven-and-one-half and a maximum of fifteen years incarceration, nothing beyond his bare assertion shows that, had it been offered, he would not have pled guilty in exchange for the sentence he actually received. *See Williams,* 591 F.2d at 173; *Kelleher,* 531 F.2d at 82. He certainly has not shown that his plea was induced by the misinformation. Under these circumstances, the State should not suffer the prejudice of attempting to bring this case to trial seven years after the accused pled guilty. *See Black,* 506 F.Supp. at 630. The plea will not be set aside on this ground.

Petitioner's second claim that his conviction should be set aside because he was denied the effective assistance of counsel must also be denied. Plea bargaining was a valid strategy in which petitioner undeniably acquiesced. Despite the misinforma-

tion, petitioner's decision to plead was a rational and counseled one, and it resulted in a reasonable sentence. He pled without any promise on the persistent felony offender issue; if that statute had been applicable, he still could have been sentenced to a life term. Counsel's error in estimating that such a risk existed was not the cause of the resolution of this case by guilty plea, and it cannot therefore be the basis for vacating the conviction.

The writ is denied.

SO ORDERED.